WALTER A. LAVENDER, Administrator de bonis non of the Estate of L. E. HANEY, Deceased, v. J. M. KURN et al., Trustees of ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, Debtor, and ILLINOIS CENTRAL RAILWAY COMPANY, Appellants.—No. 39174.—189 S. W. (2d) 253.

Division One, June 4, 1945.

Rehearing Denied, July 2, 1945.

Motion to Modify Overruled, September 4, 1945.

(196)

*M. G. Roberts, E. G. Nahler, A. P. Stewart* and *C. H. Skinker, Jr.,* for appellants J. M. Kurn et al., Trustees.

*Watts & Gentry* for appellant Illinois Central Railroad Company; *John W. Freels* of counsel.

*N. Murry Edwards, James A. Waechter* and *Douglas H. Jones* for respondent Walter A. Lavender, Admr.

BRADLEY, C.—Action under the Federal Employers' Liability Act, 45 U. S. C. A., Secs. 51 et seq., to recover damages for the death of L. E. Haney. Verdict and judgment for $30,000 went for plaintiff and defendants appealed.

Haney was a switch tender in the railroad yards of Memphis, Tennessee, and was killed, while on duty, December 21, 1939, about 7:30 P. M. by being struck in the back of the head by some object. If deceased was an employee of defendants, then it is conceded the cause is properly under the Federal Employers' Liability Act.

Error is assigned (1) on the refusal of a demurrer to the evidence; (2) on the admission of evidence; (3) on giving plaintiff's instruction No. 2 and refusing defendant trustees' instruction C; and (4) on an alleged excessive verdict. One phase of the alleged incompetent evidence is of importance in connection with the demurrer as we shall see.

It was plaintiff's theory that Haney was the employee of the trustee defendants ▆▆▆ *and* the Illinois Central, and that his death was caused by being struck by a mail hook or mail catcher arm, hereinafter for the most part, referred to as the mail hook, swinging out from the side of a Frisco mail car. Defendants contend that there was no substantial competent evidence to support such theory, and it is contended that Haney was not the employee of the Frisco trustees *or* of the Illinois Central, but was the employee of the Yazoo & Mississippi Valley Railroad Company. The demurrer raises two questions: Was there substantial competent evidence that Haney was struck by the mail hook? and, Was there substantial evidence that Haney was the employee of defendants?

The Frisco train involved was a passenger train, consisting of 12 cars, made up of 3 baggage cars, 1 mail car which was next to the tender; other cars were Pullmans and chair cars. The train was from Birmingham, Alabama, and its destination was Kansas City, Missouri. The Frisco tracks in the yards extend east and west and the Illinois Central tracks extend north and south. The Frisco train approached from the east, but stopped east of the Illinois Central tracks. Haney's shanty (office) was west of the Illinois Central tracks, and north of the Frisco mainline track, on which the Frisco train approached from the east. The Illinois Central's Grand Central station was about 2700 feet north of the Frisco mainline track. There was a Frisco switchstand about 200 or 250 feet west of Haney's shanty and on the north side of the mainline Frisco track, by which switch the tracks were so lined that a train could back into the Grand Central Station. In order to reach the Grand Central Station the Frisco train moved west on its mainline track until the rear passed this switchstand, and then Haney lined the switch so the train could back into the station.

The Frisco train started up from the point where it had stopped east of the Illinois Central tracks, moved west until its rear was 20 or 30 feet west of this switch; Haney, as stated, then lined the switch and the train backed east to the switch and there entered the track which turned north to the station. Rule 104, so defendants claim, required Haney, after he lined the switch, to cross to the south side of the track, and the Frisco conductor, who was standing on the rear of his train, testified that he (Haney) did so cross after he lined the switch, and the last he saw of him "he was standing south of the track." But it was Haney's duty to close the switch when the train cleared, then return to his shanty and give the green light to any train that wanted to cross the Frisco tracks. The Frisco train cleared the switch backing into the station, but the red lights at Haney's shanty remained on. Investigation was made by John Joseph Bruso, yard conductor of the Illinois Central, and Haney was found unconscious on the north side of the track with a wound

in the back of his head. An ambulance was called, but he was dead when the ambulance arrived at the hospital.

On the north side of the track at the switch was a mound about 2 feet in height which came up within about 3 feet of the north rail. The overhang of the Frisco mail car was about 2 feet, hence the mound came up or extended south to a point about one foot north of the side of the mail car as it passed the switch. Based on the evidence of plaintiff's witness Farmer, infra, the only witness who testified about mail hooks, it could be inferred that there was a knob like iron curl or ring on the end of the mail hook on the side of the mail car which passed over the switch Haney lined, which knob, when the arm is down and resting against the side of the car, is about 6 feet 8 inches above the top of the rail, which is 7 inches high. The ties were imbedded at the switch so that the tops thereof were about level with the ground. Hence the knob at rest against the side of the mail car was 6 feet 8 inches above the ground level, or 4 feet 8 inches above the top of the mound. Haney was about 5 feet 8 inches in height, and standing on the mound the top of his head was one foot higher than the knob at rest against the side of the car. The wound was on the back of Haney's head and, it may be inferred, about 4 inches below the top of the head, hence, with Haney standing erect on the mound, the knob was 8 inches below the place of the wound. However, as we understand, the mail hook ascends as it extends out. In stating the evidence of witnesses, we have made some omissions, appearing in the record, but we have omitted the usual signs of omission.

C. Bruce Farmer, a witness for plaintiff and referred to, supra, testified: "I live in Kirkwood, Missouri; am a railway postal clerk; run on the Burlington; ▇▇▇ have been running on the railroad as a railway mail clerk since 1925; last night I made some measurements of mail pouch hooks on trains; I measured a Frisco car and it was 6 feet 8 inches from the bottom of the catcher arm to the top of the ties. When the (side) door is closed, the catcher arm could swing out a little ways, and when it swung the full distance it was 7 feet 3 inches from the bottom of the catcher arm to the top of the ties. With the door open (and the handle pulled down inside) it would have been 9 feet from the top of the ties. I measured another Frisco car and it (mail hook) was 6 feet 8 inches from the top of the ties. These measurements are from the top of the ties up to the bottom of the iron hanging down. In my experience I have seen the catcher arm swing out (with door closed) as far as a foot. If the door is open (and handle pulled down) the catcher arm can swing out as far as 2 feet 2 inches, to 3 feet, but they won't swing out unless somebody pulls them up; somebody has to get hold of the handle and pull them up. They won't swing more than 12 inches without that (there was no evidence that the door was open or handle pulled down);

it pivots just from the sway of the train. They won't swing any farther with the door open. I have never seen those catcher arms swing out without any force from the mail operator more than one foot from the side of the car, and that would ordinarily be going around a curve or at an excessive speed of the train so that it would rock.

"In coming into the Union Station at St. Louis, nearly all of the trains pull up and back around a curve with the back end going into the station first. I have seen that done hundreds of times. In backing in at a speed of 10 miles an hour or less over a switch, if the track was smooth, would not throw the mail catcher arm out from the bottom of the car at all, but if the track was wavy, it might. It might come out a little distance from the bottom, but ordinarily not as much as a foot from the side of the car. The mail catcher arm itself is about 26½ inches, but the bracket takes up 3½ to 4 inches and the total makes an extreme extension of about 30 inches. The bottom of the catcher arm is round and is about 3 inches in diameter. I mean the knob down at the extreme end. The end of the catcher arm which I have designated as a knob is more correctly designated as a loop. It is round, but is like a ring and curved so it won't run through a pouch."

J. E. Mee, engineer on the Frisco train involved and a witness for defendant, testified: "We went the length of 3 cars and a locomotive beyond that shanty (Haney's shanty) and stopped on a signal from the conductor on the rear of the train. I got a blast of 3 whistles on the air from the conductor to start backing up. I couldn't see the back end of the train from my position in the cab because of a curve. In starting the backward movement I always looked back at the movement of the train, turned and faced the rear end, in the direction we were going, and watched the movement of the train. That is my duty, to look down to the back and alongside my train as I start backing. We lean out of the window to do that. It is up to the engineer whether he leans out the side or looks through the rear vision window. The first cars I was looking at would be the mail and baggage cars, and I was looking back along the north side of them and as far back as I could see. As we made that backward movement the conductor controlled the air brake on the train from the rear end of the train. We stopped the train on that occasion before we got into the station and, with his signal which I had to get from him before I could move, I started again. I could see nothing of the rear end. It was on the curve and out of sight. After stopping and getting his signal to proceed, I backed on clear into the station. I did not see Haney or any person at that switch as I approached (backing in) and passed it. I didn't see any person lying on the ground or standing up there or anybody at all near the side of my

train. I was at all times looking out of my window toward the rear and past the side of the mail and baggage cars at the head of the train. I was backing around the curve to the left and north and upgrade. We were going approximately 8 miles an hour before I got the signal to stop. I suppose we backed up about 300 feet or something like that when I was stopped. After that I got another signal to back up and I backed up and continued backing on into the station.

It could be inferred from the facts that Haney could have been struck by the mail hook knob *if* he were standing on the south side of the mound and the mail hook extended out as far as 12 or 14 inches. But in this connection there are two questions: Was there substantial evidence that the mail hook extended out to any extent as the mail car was backed by the mound and over the switch? and, Was there any substantial evidence that Haney, when struck, was standing at a point or place on the mound where he could have been struck by the mail hook extended as the mail car passed the switch and mound?

Both sides of the Frisco train were examined before it left the station and nothing was found extending out from the sides. As appears, supra, Bruso, yard conductor for the Illinois Central, made an investigation when the red light did not change at Haney's shanty. Bruso was the first, so far as appears, to see Haney after he was injured, and as a witness for defendants, testified that Haney was lying on his stomach, body extending north and south, and was 14 feet west of the switch; that the right side of his face was down and his head 5 feet 9 inches (determined by actual measurement) north of the north rail of the Frisco track with the feet extending back north; that there was a small pool of blood right at his mouth; that "there was a small space where his toes had drug (south) as the weight of his body, where he fell forward. I imagine those marks were 12 or 13 feet north of the north rail of the Frisco track. They appeared to be about the length of his body back from his head as though slipped forward. I was the first one to him. There was nobody else around there that I could see anywhere at that time." There was a telephone pole "immediately north of where dragging of his feet was."

Bruso, after seeing the situation, went back east "just the other side of Haney's shanty", and called Bundy and Arnold, Illinois Central switchmen, and told them Haney was hurt, and Bundy went back to Haney with Bruso; no one was there when they arrived. Bruso further testified: ".We raised up Mr. Haney's body and turned. him over. When we raised him up his left hand was at his chest with his lantern in it. His right hand was on the lower part of his stomach with his pistol in his hand loose. His hand was open and his pistol in it. We turned him around to the northwest so that his head would be at the side of the mound."

As a witness for plaintiff. Bundy testified: "When we (Bundy and Bruso) got to the switch we found Mr. Haney lying on the ground, face down. He was north of the switch and a little to the west of it, probably 2 or 3 feet west. His head was pointed south, kind of an angle. The Frisco track runs east and west at the point. Haney's head was pointed a little south and east and his feet extended northward, kind of an angle. I would say Haney's head was about 6 feet from the switch, that is north of it, and a little to the west. . . . I saw a pistol lying under Haney's body. I think Haney was about 5 feet 10 inches in height. I would say his feet were about 10 feet north of the north rail of the Frisco track and extended straight back of him, not doubled under him. We turned him over. Before we turned him over I saw right on the back of his head a gash about 2 inches long. It was bleeding. I saw no other injury. Mr. Bruso and I were the only ones present when we turned him over. Before we turned him over I did not see his lantern or pistol. After I turned him over I saw that the pistol and lantern were under his body. When we turned him over the pistol came into view. It indicated it might have slipped out of his pocket, and probably did. His clothing showed nothing to indicate a struggle. The Frisco train had just backed east and turned north into the station. After that Frisco train backed in, to the best of my knowledge, I would say it was 10 minutes before we went up there and found Mr. Haney's body. During that 10 minutes I had been waiting for a signal that Mr. Haney operates over in his shanty.

"The first man who came up after us to the scene was Mr. Cowan (I. C. switchman—not a witness). The two of us (Bruso and Bundy) didn't remain there very long, not over 5 minutes, if I remember right. Bruso then went and called an ambulance. We turned Haney around and I raised him up and put his head in my lap, squatted down and put his head in my lap. He was alive, but not able to talk. His face was bruised from hitting the ground. I believe the bruise was on the left side of his cheek bone and there were cinders on his face. It appears that the injury to his face was caused by hitting the cinders with his face in falling. I don't think it was more than 10 or 12 minutes after the ambulance was called until it got there. In turning Haney over we turned him toward the east and turned around to the north and east, turned his head more to the north."

Alvin Haney, son of deceased, was at the Frisco switch shortly after his father was removed in the ambulance, and also went to the switch next morning. When there shortly after his father was removed, it was too dark to see well. He testified as to what he observed next morning: "From what they showed me I will say there was a spot of blood from 6 to 8 inches across. It was east of the switch and north of the Frisco tracks. I would say it was between

3 and 4 feet north of the north rail of the Frisco track and around 6 or 8 feet east of that switch.''

E. L. Gates, dispatcher for the Arkansas & Memphis Railway Bridge Terminal Company, was a witness for plaintiff. He said that when he arrived Haney was on top of the mound, north of the switch, and 12 or 15 feet ''due north from the north rail of the Frisco track, lying on his back with his feet toward the track, his feet nearest the track. Someone, I don't know who, was holding his head up. That mound north of the tracks near the switch was, I would say, about two feet high, that is, above the rail of the Frisco tracks. I would say it was possibly ten or twelve feet from the mound to the north rail of the Frisco tracks. It was just loose dirt that had been thrown out there until it was built up to the height of possibly two feet, and I would say that the base of it came probably within ten feet of the north rail. That was down at the level of the ground, and then it slopes back a little to the peak of the mound. I know nothing more about the case other than that Haney was wearing a white cap and it was new or practically new, had not become soiled; and I looked at the cap and at a point on the back of it there was a dirty spot on the outside of the cap. There were no blood stains, but just a black spot, and I was told later that that corresponded with the location of the injury on the back of his head, a little to the right of the center of the head, and a little lower than the crown of the head. Possibly just a little above the top of the ear. The mark on the cap was about the width of my finger and possibly an inch and a half long. It seemed like it just angled down, not across.''

Dr. W. E. Turner, Jr., witness for plaintiff, testified that at the hospital he assisted in the autopsy on the body of Haney on the night he was killed and ''our conclusion was that the skull was fractured by some fast moving small round object. I guess it would be possible for that small round fast moving object to be a rod or something projecting out from a train that was going 8 or 10 miles an hour. I don't know anything about it, but I think it could be. Maybe an iron pipe.''

John Joseph Drashman, Frisco coach foreman, was plaintiff's witness. Plaintiff took his deposition and when plaintiff offered the deposition at the trial, objection was made because the witness was present. Drashman testified at the trial that he went to the place of Haney's injury with the Frisco superintendent of terminals, but that Haney had been removed when he arrived. In his deposition he said he went before Haney was removed and testified as to where Haney was lying and about the wound, etc. In the deposition and at the trial he testified he examined the fireman's side of the train more carefully than the engineer's side and did so because he was told by an Illinois Central switchman that Haney ''was supposed to have

been struck by something protruding on the side of the train." In the deposition he said that this was told to him at the place of injury and while "Haney's body was lying on the ground."

It appears in the record that the area immediately about the switch was not very well lighted, was dark, and that at night, in this area, many hoboes and tramps, white and colored, "hop freight trains and get rides out of there." Such situation was likely the reason for Haney having a pistol. The police homicide squad made an investigation of Haney's death and the measurement referred to, supra, in the evidence of Bruso, was made by the police in Bruso's presence. Six days after Haney was killed his billfold was found on a high board fence railing about a block from the place where Haney was killed. It contained no money, but contained Haney's social security card and other things. The billfold was not soiled; "it did not appear to have been lying out in the rain or snow." It was found near the place where Haney was placed in the ambulance. Haney had a gold watch and a diamond ring. These were "still on him at the hospital. He never carried much money, not very much more than $10."

Plaintiff contends that the evidence of Drashman as to what was told to him by an Illinois Central switchman was competent under the rule of res gestae, and that under all the evidence plaintiff made a submissible case on the question as to whether Haney was struck by the mail hook. There was no evidence, expert or otherwise, that the condition of the track and the speed of the backup movement, and whatever curve there was, all considered together, might have caused the mail hook to swing out the 12 or 14 inches necessary to strike Haney, assuming, of course, he was standing on the mound and at a place where such swing out would reach him. Can such extension of the mail hook be reasonably inferred from the evidence of Farmer and all the other facts and circumstances? Would such an inference be based on speculation and conjecture? Also, there is the question, assuming that the mail hook so extended out, Was there substantial evidence that it was the mail hook that struck Honey? It would seem reasonable that if Haney was struck by the mail hook he would have fallen at least somewhat parallel to the track, but the evidence of those first to him is that when Haney was found he was some 6 feet north of the north rail and lying at right angles to the track with his head toward the track and his feet extending back north. And there was evidence that his toes had dragged forward (south) some few inches in falling, as if the blow had come from the north when he was facing south. Alvin Haney, however, said that the blood was between 3 or 4 feet north of the north rail.

As indicated, supra, the competence of the evidence of witness Drashman as to what the unnamed Illinois Central switchman told

him about it being supposed that Haney was struck by something protruding on the side of the train is of importance in connection with the demurrer to the evidence. As stated, plaintiff contends this evidence is competent under the rule of res gestae. Many cases are cited on the *time* element in res gestae, but for such element we will assume without deciding, that the evidence as to lapse of time is sufficient under the rule of res gestae. It is not claimed that the unnamed switchman who made the statement to Drashman was speaking from his own knowledge, but from what he had heard. In other words, the *statement itself* claimed to be competent under the res gestae rule was based on *hearsay*. Can such, under any circumstances, be competent under the rule of res gestae? We do not think so.

In the brief counsel say: "Statements of strangers ordinarily classed as hearsay will be admitted as res gestae if they are made as a part of the transaction and so closely connected therewith that the witness has no time to reflect or to make up a story that is not true." In support of such contention many Missouri cases are cited. Among these are Roach v. Kansas City Public Service Company (Mo. Sup.), 141 S. W. (2d) 800; Pryor v. Payne, 304 Mo. 560, 263 S. W. 982; Brinkley v. United Biscuit Co. et al., 349 Mo. 1227, 164 S. W. (2d) 325; Sconce v. Jones, 343 Mo. 362, 121 S. W. (2d) 777. We have examined all the cases cited by plaintiff and find that in each case the statement held competent under the res gestae rule was made by one having first hand information. We find no case where it has even been contended that a statement based on hearsay, as in the present case, may be competent under the rule of res gestae. It is true that the res gestae rule of evidence is an exception to the hearsay rule, but this does not mean that what we may term the res gestae evidence may be based on hearsay. This is quite clearly indicated in the Sconce case, supra, in which, and in dealing with the res gestae rule, it is said [121 S. W. (2d) l. c. 781].:

"The principal reason for excluding testimony as to statements made by others out of court is that the test of cross examination, of the person making them at the time they are made, is unavailable as a safeguard against falsification or inaccuracy. This is the basis of the hearsay rule. The statements, herein involved, must come in, if at all, under the classification of the exception (res gestae) of the hearsay rule, which under certain circumstances permits testimony as to *statements, made by a person involved in or present at an accident* (italics ours), declaring the circumstances of an injury at or after its occurrence."

We think it quite clear and therefore rule that the statement of the switchman that Haney was supposed to have been struck by something protruding on the side of the train was not competent under the res gestae rule.

■ A court should never withdraw a question from the jury unless all reasonable men in the honest exercise of a fair and impartial judgment would draw the same conclusion from the facts which ■ condition the issue. Courtney v. Ocean Accident & Guaranty Corporation, 346 Mo. 703, 142 S. W. (2d) 858; but it is well settled that verdicts may not be based on conjecture and speculation. Hamilton v. St. Louis-San Francisco Ry. Co., 318 Mo. 123, 300 S. W. 787; Mullen v. Lowden et al., 344 Mo. 40, 124 S. W. (2d) 1152; Lappin v. Prebe et al., 345 Mo. 68, 131 S. W. (2d) 511; Federal Cold Storage Co. v. Pupillo, 346 Mo. 136, 139 S. W. (2d) 996, 1. c. 1001, and cases there cited. Also, it is well settled that a mere possibility of negligence is not a sufficient foundation for an inference of negligence which will justify submission of a case to a jury. Mullen v. Lowden et. al., supra [124 S. W. (2d) 1. c. 1156].

■ With the hearsay eliminated, we think that all reasonable minds would agree that it would be mere speculation and conjection to say that Haney was struck by the mail hook, and we are constrained to rule that plaintiff failed to make a submissible case on that question. And we also rule that there was no substantial evidence that the uneven ground and insufficient light were causes or contributing causes of the death of Haney. It will not be necessary to rule other questions. The judgment should be reversed, and it is so ordered. *Dalton* and *Van Osdol, CC.,* concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.