LAVENDER, ADMINISTRATOR, *v.* KURN ET AL., TRUSTEES, ET AL.

No. 550.   Argued March 6, 7, 1946.—Decided March 25, 1946.

*N. Murry Edwards* argued the cause for petitioner. With him on the brief were *James A. Waechter* and *Douglas H. Jones.*

*Cornelius H. Skinker, Jr.* argued the cause for Kurn et al., respondents. With him on the brief were *Maurice G. Roberts* and *Alexander P. Stewart.*

*Wm. R. Gentry* argued the cause for the Illinois Central Railroad Co., respondent. With him on the brief were *C. A. Helsell* and *John W. Freels.*

MR. JUSTICE MURPHY delivered the opinion of the Court.

The Federal Employers' Liability Act permits recovery for personal injuries to an employee of a railroad engaged in interstate commerce if such injuries result "in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment." 45 U. S. C. § 51.

Petitioner, the administrator of the estate of L. E. Haney, brought this suit under the Act against the respondent trustees of the St. Louis-San Francisco Railway Company (Frisco) and the respondent Illinois Central Railroad Company. It was charged that Haney, while employed as a switch-tender by the respondents in the switchyard of the Grand Central Station in Memphis, Tennessee, was killed as a result of respondents' negligence. Following a trial in the Circuit Court of the City of St. Louis, Missouri, the jury returned a verdict in favor of petitioner and awarded damages in the amount of

$30,000. Judgment was entered accordingly. On appeal, however, the Supreme Court of Missouri reversed the judgment, holding that there was no substantial evidence of negligence to support the submission of the case to the jury. 354 Mo. 196, 189 S. W. 2d 253. We granted certiorari to review the propriety of the Supreme Court's action under the circumstances of this case.

It was admitted that Haney was employed by the Illinois Central, or a subsidiary corporation thereof, as a switch-tender in the railroad yards near the Grand Central Station, which was owned by the Illinois Central. His duties included the throwing of switches for the Illinois Central as well as for the Frisco and other railroads using that station. For these services, the trustees of Frisco paid the Illinois Central two-twelfths of Haney's wages; they also paid two-twelfths of the wages of two other switch-tenders who worked at the same switches. In addition, the trustees paid Illinois Central $1.87½ for each passenger car switched into Grand Central Station, which included all the cars in the Frisco train being switched into the station at the time Haney was killed.

The Illinois Central tracks run north and south directly past and into the Grand Central Station. About 2,700 feet south of the station the Frisco tracks cross at right angles to the Illinois Central tracks. A west-bound Frisco train wishing to use the station must stop some 250 feet or more west of this crossing and back into the station over a switch line curving east and north. The events in issue center about the switch several feet north of the main Frisco tracks at the point where the switch line branches off. This switch controls the tracks at this point.

It was very dark on the evening of December 21, 1939. At about 7:30 p. m. a west-bound interstate Frisco passenger train stopped on the Frisco main line, its rear some 20 or 30 feet west of the switch. Haney, in the performance of his duties, threw or opened the switch to permit

the train to back into the station. The respondents claimed that Haney was then required to cross to the south side of the track before the train passed the switch; and the conductor of the train testified that he saw Haney so cross. But there was also evidence that Haney's duties required him to wait at the switch north of the track until the train had cleared, close the switch, return to his shanty near the crossing and change the signals from red to green to permit trains on the Illinois Central tracks to use the crossing. The Frisco train cleared the switch, backing at the rate of 8 or 10 miles per hour. But the switch remained open and the signals still were red. Upon investigation Haney was found north of the track near the switch lying face down on the ground, unconscious. An ambulance was called, but he was dead upon arrival at the hospital.

Haney had been struck in the back of the head, causing a fractured skull from which he died. There were no known eyewitnesses to the fatal blow. Although it is not clear, there is evidence that his body was extended north and south, the head to the south. Apparently he had fallen forward to the south; his face was bruised on the left side from hitting the ground and there were marks indicating that his toes had dragged a few inches southward as he fell. His head was about 5½ feet north of the Frisco tracks. Estimates ranged from 2 feet to 14 feet as to how far west of the switch he lay.

The injury to Haney's head was evidenced by a gash about two inches long from which blood flowed. The back of Haney's white cap had a corresponding black mark about an inch and a half long and an inch wide, running at an angle downward to the right of the center of the back of the head. A spot of blood was later found at a point 3 or 4 feet north of the tracks. The conclusion following an autopsy was that Haney's skull was fractured by "some fast moving small round object." One of the

examining doctors testified that such an object might have been attached to a train backing at the rate of 8 or 10 miles per hour. But he also admitted that the fracture might have resulted from a blow from a pipe or club or some similar round object in the hands of an individual.

Petitioner's theory is that Haney was struck by the curled end or tip of a mail hook hanging down loosely on the outside of the mail car of the backing train. This curled end was 73 inches above the top of the rail, which was 7 inches high. The overhang of the mail car in relation to the rails was about 2 to 2½ feet. The evidence indicated that when the mail car swayed or moved around a curve the mail hook might pivot, its curled end swinging out as much as 12 to 14 inches. The curled end could thus be swung out to a point 3 to 3½ feet from the rail and about 73 inches above the top of the rail. Both east and west of the switch, however, was an uneven mound of cinders and dirt rising at its highest points 18 to 24 inches above the top of the rails. Witnesses differed as to how close the mound approached the rails, the estimates varying from 3 to 15 feet. But taking the figures most favorable to the petitioner, the mound extended to a point 6 to 12 inches north of the overhanging side of the mail car. If the mail hook end swung out 12 to 14 inches it would be 49 to 55 inches above the highest parts of the mound. Haney was 67½ inches tall. If he had been standing on the mound about a foot from the side of the mail car he could have been hit by the end of the mail hook, the exact point of contact depending upon the height of the mound at the particular point. His wound was about 4 inches below the top of his head, or 63½ inches above the point where he stood on the mound—well within the possible range of the mail hook end.

Respondents' theory is that Haney was murdered. They point to the estimates that the mound was 10 to 15 feet north of the rail, making it impossible for the mail

hook end to reach a point of contact with Haney's head. Photographs were placed in the record to support the claim that the ground was level north of the rail for at least 10 feet. Moreover, it appears that the area immediately surrounding the switch was quite dark. Witnesses stated that it was so dark that it was impossible to see a 3-inch pipe 25 feet away. It also appears that many hoboes and tramps frequented the area at night in order to get rides on freight trains. Haney carried a pistol to protect himself. This pistol was found loose under his body by those who came to his rescue. It was testified, however, that the pistol had apparently slipped out of his pocket or scabbard as he fell. Haney's clothes were not disarranged and there was no evidence of a struggle or fight. No rods, pipes or weapons of any kind, except Haney's own pistol, were found near the scene. Moreover, his gold watch and diamond ring were still on him after he was struck. Six days later his unsoiled billfold was found on a high board fence about a block from the place where Haney was struck and near the point where he had been placed in an ambulance. It contained his social security card and other effects, but no money. His wife testified that he "never carried very much money, not very much more than $10." Such were the facts in relation to respondents' theory of murder.

Finally, one of the Frisco foremen testified that he arrived at the scene shortly after Haney was found injured. He later examined the fireman's side of the train very carefully and found nothing sticking out or in disorder. In explaining why he examined this side of the train so carefully he stated that while he was at the scene of the accident "someone said they thought that train No. 106 backing into Grand Central Station is what struck this man" and that Haney "was supposed to have been struck by something protruding on the side of this train." The foreman testified that these statements were made by an

unknown Illinois Central switchman standing near the fallen body of Haney. The foreman admitted that the switchman "didn't see the accident . . ." This testimony was admitted by the trial court over the strenuous objections of respondents' counsel that it was mere hearsay falling outside the *res gestae* rule.

The jury was instructed that Frisco's trustees were liable if it was found that they negligently permitted a rod or other object to extend out from the side of the train as it backed past Haney and that Haney was killed as the direct result of such negligence, if any. The jury was further told that Illinois Central was liable if it was found that the company negligently maintained an unsafe and dangerous place for Haney to work, in that the ground was high and uneven and the light insufficient and inadequate, and that Haney was injured and killed as a direct result of the said place being unsafe and dangerous. This latter instruction as to Illinois Central did not require the jury to find that Haney was killed by something protruding from the train.

The Supreme Court, in upsetting the jury's verdict against both the Frisco trustees and the Illinois Central, admitted that "It could be inferred from the facts that Haney could have been struck by the mail hook knob *if* he were standing on the south side of the mound and the mail hook extended out as far as 12 or 14 inches." But it held that "all reasonable minds would agree that it would be mere speculation and conjecture to say that Haney was struck by the mail hook" and that "plaintiff failed to make a submissible case on that question." It also ruled that there "was no substantial evidence that the uneven ground and insufficient light were causes or contributing causes of the death of Haney." Finally, the Supreme Court held that the testimony of the foreman as to the statement made to him by the unknown switchman was inadmissible under the *res gestae* rule since the switchman spoke from what he had heard rather than from his own knowledge.

We hold, however, that there was sufficient evidence of negligence on the part of both the Frisco trustees and the Illinois Central to justify the submission of the case to the jury and to require appellate courts to abide by the verdict rendered by the jury.

The evidence we have already detailed demonstrates that there was evidence from which it might be inferred that the end of the mail hook struck Haney in the back of the head, an inference that the Supreme Court admitted could be drawn. That inference is not rendered unreasonable by the fact that Haney apparently fell forward toward the main Frisco track so that his head was 5½ feet north of the rail. He may well have been struck and then wandered in a daze to the point where he fell forward. The testimony as to blood marks some distance away from his head lends credence to that possibility, indicating that he did not fall immediately upon being hit. When that is added to the evidence most favorable to the petitioner as to the height and swing-out of the hook, the height and location of the mound and the nature of Haney's duties, the inference that Haney was killed by the hook cannot be said to be unsupported by probative facts or to be so unreasonable as to warrant taking the case from the jury.

It is true that there is evidence tending to show that it was physically and mathematically impossible for the hook to strike Haney. And there are facts from which it might reasonably be inferred that Haney was murdered. But such evidence has become irrelevant upon appeal, there being a reasonable basis in the record for inferring that the hook struck Haney. The jury having made that inference, the respondents were not free to relitigate the factual dispute in a reviewing court. Under these circumstances it would be an undue invasion of the jury's historic function for an appellate court to weigh the conflicting evidence, judge the credibility of witnesses and

arrive at a conclusion opposite from the one reached by the jury. See *Tiller* v. *Atlantic Coast Line R. Co.*, 318 U. S. 54, 67–68; *Bailey* v. *Central Vermont R. Co.*, 319 U. S. 350, 353–354; *Tennant* v. *Peoria & P. U. R. Co.*, 321 U. S. 29, 35. See also Moore, "Recent Trends in Judicial Interpretation in Railroad Cases Under the Federal Employers' Liability Act," 29 Marquette L. Rev. 73.

It is no answer to say that the jury's verdict involved speculation and conjecture. Whenever facts are in dispute or the evidence is such that fair-minded men may draw different inferences, a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference. Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear. But where, as here, there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion. And the appellate court's function is exhausted when that evidentiary basis becomes apparent, it being immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable.

We are unable, therefore, to sanction a reversal of the jury's verdict against Frisco's trustees. Nor can we approve any disturbance in the verdict as to Illinois Central. The evidence was uncontradicted that it was very dark at the place where Haney was working and the surrounding ground was high and uneven. The evidence also showed that this area was entirely within the domination and control of Illinois Central despite the fact that the area was technically located in a public street of the City of Memphis. It was not unreasonable to conclude that these conditions constituted an unsafe and dangerous working place and that such conditions contributed in part to Haney's death, assuming that it resulted primarily from the mail hook striking his head.

In view of the foregoing disposition of the case, it is unnecessary to decide whether the allegedly hearsay testimony was admissible under the *res gestae* rule. Rulings on the admissibility of evidence must normally be left to the sound discretion of the trial judge in actions under the Federal Employers' Liability Act. But inasmuch as there is adequate support in the record for the jury's verdict apart from the hearsay testimony, we need not determine whether that discretion was abused in this instance.

The judgment of the Supreme Court of Missouri is reversed and the case is remanded for whatever further proceedings may be necessary not inconsistent with this opinion.

*Reversed.*

The CHIEF JUSTICE and MR. JUSTICE FRANKFURTER concur in the result.

MR. JUSTICE REED dissents.

MR. JUSTICE JACKSON took no part in the consideration or decision of this case.