Opinion issued August 21, 2014



In The

# Court of Appeals

For The

# First District of Texas

—————————————

## NO. 01-12-01029-CV

—————————————

**UNION PACIFIC RAILROAD COMPANY, Appellant**

**V.**

**ESTATE OF GERONIMO GUTIERREZ, DECEASED, AND AMELIA GUTIERREZ AND ADRIAN GUTIERREZ, INDIVIDUALLY IN THEIR CAPACITIES AS DEPENDENTS OF GERONIMO GUTIERREZ, DECEASED, AND AMELIA GUTIERREZ, IN HER CAPACITY AS ADMINISTRATRIX OF THE ESTATE OF GERONIMO GUTIERREZ, Appellees**

On Appeal from the Probate Court No. 4
Harris County, Texas
Trial Court Case No. 380, 337-401

# O P I N I O N

In this Federal Employers' Liability Act ("FELA") case,[1] Union Pacific Railroad Company appeals from the final judgment rendered on the jury's verdict in favor of the estate of Geronimo Gutierrez, deceased, Amelia Gutierrez and Adrian Gutierrez, individually in their capacities as dependents of Geronimo Gutierrez, deceased, and Amelia Gutierrez, in her capacity as administratrix of the estate of Geronimo Gutierrez. In two issues, appellant contends that the trial court erred by (1) denying its motion for judgment notwithstanding the verdict because appellees failed to present legally sufficient evidence of causation and (2) including an instruction in the jury charge on assumption of the risk. We affirm the trial court's judgment.

## Background

### A. Undisputed Facts

In May 2007, Geronimo Gutierrez ("Gutierrez"), who had worked for Union Pacific since 1979, was a carman responsible for repairing and maintaining railcars in the repair track complex ("RTC") of appellant's Englewood Yard in Houston, Texas. On May 12, 2007, at about 6:15 a.m., Gutierrez's shift was about complete when he fell from a railcar and broke his left leg. Paramedics transported him to the hospital where he underwent three surgeries and, on May 20, 2007, was released and sent home. Gutierrez returned to the hospital three days later

---

[1]     45 U.S.C. § 51 (2011).

complaining of a headache at which point the doctors discovered that he had suffered a complication from the anti-clotting medication, causing a brain hemorrhage from which he died the next day.

On December 12, 2009, appellees filed suit against appellant asserting claims under FELA. Following the trial court's denial of appellant's traditional and no-evidence motions for summary judgment, the case proceeded to trial on June 19, 2012.

## B. Theories of the Case

### 1. Appellees' Theory

Appellees argued that a longstanding drainage problem in Englewood Yard had created muddy conditions between the tracks where Gutierrez was working on the morning of his fall. In support of this position, other Union Pacific employees testified regarding the history of poor drainage and resulting mud between the tracks where Gutierrez worked and at the switches which he would have traveled prior to his injury. In particular, the jury heard testimony that the drainage problem which had existed for decades was beyond "typical Houston"; "[Water] stood everywhere. We referred to it as Lake Englewood"; and "We make fun of it. Sometimes, we ask for boats instead of four wheelers." A retired Union Pacific frontline supervisor testified that "the drainage was always bad, you know," and that the employees he supervised complained at daily briefings of the

3

inconvenience and safety concerns posed by the muddy conditions. When he notified upper management of the employees' complaints and of their request that the road be paved, they responded that "it was just way too expensive to pave that whole area."

The jury also heard from Alan Blackwell, a retired Union Pacific track manager and expert in rail yard drainage and ground conditions, who testified that an inadequate drainage system resulting in standing water causes "[the natural soil underneath] to percolate up, and it's going to cause soft track. And . . . it's not going to provide a safe walking surface. It's going to be mud." After reviewing photographs taken during appellees' onsite inspection of the RTC, Blackwell testified that the conditions reflected in the photographs were consistent with the testimony and statements of employees regarding a longstanding drainage problem. He further testified that the RTC's drainage and ground conditions conformed neither to the standard of care in the railroad industry in general nor to the standard of care adhered to by Union Pacific when he worked for the company. According to Blackwell, if appellant had dedicated reasonable and adequate resources and effort, it could have obtained adequate drainage and prevented the standing water and muddy conditions in the RTC at Englewood Yard.

With regard to Gutierrez's injury, appellees presented the testimony of Calvin Parker, the emergency medical technician ("EMT") who attended to

4

Gutierrez at the scene of the accident and transported him to the hospital. When Parker arrived at the scene, he found Gutierrez under the ladder of the railcar. Gutierrez told him that he had "slipped while climbing a ladder on a railcar" and that he had fallen a distance of "around four [feet]" and landed "on his feet." The hospital records reflect that Gutierrez told medical providers that he had fallen from a ladder.

Parker further testified that there was mud on Gutierrez's boots, and that he was "sure" there was mud on the ground in the area between the ambulance and Gutierrez. According to Parker, this was his first time to respond to a call inside the rail yard and, despite the passage of time, it still "stood out in [his] mind." Specifically,

> I recall from taking the stretcher from the ambulance where it was parked to where Geronimo was and the process of doing so, a lot of the stretcher tires from the stretcher collected mud. We removed his boot to splint his leg or, technically, his leg. It seemed in line with the story he gave us about the fall in general and muddy boots. Put the boots on the stretcher, as we normally do. We left his right boot on. There was no reason to remove it. When we cleaned the sheets— every time we go to the hospital, we take off the sheets and put on a new pair of linens on the stretcher. And they were muddy in the area of the boots.

Parker further testified that he had to use a garden hose at the emergency room to wash off the gurney. The jury also heard testimony that it had rained earlier in the morning of Gutierrez's shift before the accident.

5

Appellees also presented Dr. Tyler Kress, an expert in industrial engineering safety and biomedical engineering and injury analysis, to testify regarding Gutierrez's injury. According to Dr. Kress, the type of tibia-fibula fracture that Gutierrez sustained is most commonly the result of falling from a height.[2] He testified that he has never seen this type of fracture pattern resulting from rolling one's ankle.

## 2. Appellant's Theory

At trial, appellant argued that Gutierrez had taken a prohibited shortcut to descend the railcar causing him to fall and break his leg.[3] Appellant presented manager Ronny Lewis and foreman general Bob Williamson who investigated the accident shortly after Gutierrez was transported to the hospital. Lewis testified that all of the ladders leading to the handbrakes were still covered with dew and that they noticed a trail of three boot prints beginning next to where they found

---

[2] The other two scenarios where this type of fracture is typically seen are motor vehicle accidents and explosions, neither of which is argued or raised by the evidence in this case.

[3] To release a handbrake on a railcar, a Union Pacific carman must climb a ladder attached to the side of the railcar using a three-point contact (i.e., keeping two hands and one foot or two feet and one hand on the ladder at all times). Once a carman climbs two steps up the ladder, he must step around the corner of the railcar and then onto a crossover platform on the back of the railcar. While standing on the platform, he then releases the handbrake. Once the handbrake is released, the carman reverses the process and maintains a three-point contact to descend the ladder. According to appellant, carmen occasionally take a prohibited shortcut to access the crossover platform—by stepping from the ground, to the rail, to a device called an angle cock at the back of the railcar—instead of using the ladder.

6

Gutierrez and leading up to the crossover platform at the back of the railcar, from which they concluded that Gutierrez had taken the shortcut to ascend and descend from the crossover platform, causing him to fall. Lewis and Williamson's photographs of the boot prints were admitted at trial. These photos depict no mud on the railcar or the ground. Additionally, Gutierrez's boots, which the hospital returned in a plastic bag, were not muddy.

The accident report that Gutierrez filled out in the hospital recites that he was "[g]etting down [ladder] with hands and feet one step at a time, then having reached ground with both feet on ground I turned to go East and fell." As to the specific cause of the injury, he wrote "[m]y ankle gave way and I fell." Asked on the report whether working conditions caused or contributed to the cause of his accident, Gutierrez checked off the box indicating that they did not.

## C. Jury's Verdict and Post-Judgment Proceedings

At the conclusion of trial, the jury found appellant negligent and awarded damages to appellees in the total amount of $1,192,000.00.[4] Appellant's motion for judgment notwithstanding the verdict and motion for new trial were both denied. On August 7, 2012, the trial court signed the final judgment from which appellant timely appealed.

---

[4] The jury awarded $100,000 for Gutierrez's physical pain and mental anguish; $195,000 to Amelia for past pecuniary loss and $459,000 for future pecuniary loss; and $295,000 to Adrian for past pecuniary loss and $143,000 for future pecuniary loss.

**Discussion**

## A. Causation

Appellant's first issue contends that appellees failed to meet their burden to present legally sufficient evidence of causation. Appellant argues that, contrary to appellees' theory that Gutierrez slipped off the ladder due to mud on his boots, the conclusive evidence showed that mud neither caused nor contributed to the accident. Appellees maintain that the evidence from which the jury could have found that Gutierrez's slip and fall from the railcar and subsequent injury was due to mud on his boots was legally sufficient.

### 1. Standard of Review

Under FELA, railroads are liable for employees' injuries occurring in the course of their employment resulting from the railroad's negligence. *CSX Transp., Inc. v. McBride*, ___ U.S. ___, ___, 131 S. Ct. 2630, 2634 (2011); 45 U.S.C. § 51.[5] FELA's causation burden is not the common law proximate cause standard; rather, the causation standard is one derived from the language of the statute itself that inquires "whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for

---

[5] "Cognizant of the physical dangers of railroading that resulted in the death or maiming of thousands of workers every year, Congress crafted a federal remedy that shifted part of the 'human overhead' of doing business from employees to their employers." *Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 542, 114 S. Ct. 2396, 2404 (1994) (internal quotation omitted).

which damages are sought." *McBride*, ___ U.S. at ___, 131 S. Ct. at 2636 (quoting *Rogers v. Missouri Pac. R.R. Co.*, 352 U.S. 500, 506, 77 S. Ct. 443, 506 (1957)); *see Landry v. Oceanic Contractors, Inc.*, 731 F.2d 299, 302 (5th Cir. 1984); *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406 (Tex. 1998).[6] This burden has been termed "featherweight." *Johnson v. Offshore Exp., Inc.*, 845 F.2d 1347, 1352 (5th Cir. 1988); *Ellis*, 971 S.W.2d at 406; *Diamond Offshore Mgmt. Co. v. Horton*, 193 S.W.3d 76, 79 (Tex. App.—Houston [1st Dist.] 2006, pet. denied). Nonetheless, despite FELA's lower causation standard, "a plaintiff still bears the burden of presenting evidence from which a jury could conclude the existence of a probable or likely causal relationship as opposed to merely a possible one." *Abraham v. Union Pac. R.R. Co.*, 233 S.W.3d 13, 17 (Tex. App.—Houston [14th Dist.] 2007, pet. denied), *cert. denied*, 552 U.S. 1312 (2008). Although jurors can draw reasonable inferences about causation "on the basis of common sense, common understanding, and fair beliefs," their ability to draw inferences is not limitless. *Huffman v. Union Pac. R.R.*, 675 F.3d 412, 421 (5th Cir. 2012).

In addition to a less stringent burden of proof, the standard of appellate review in FELA cases is also less stringent than under the common law. *Texas & P. Ry. Co. v. Roberts*, 481 S.W.2d 798, 800 (Tex. 1972); *Ellis*, 971 S.W.2d at 406

---

[6] When FELA cases are brought in state court, federal law governs the substantive rights of the parties, and state rules govern procedural matters. *St. Louis S.W. Ry. Co. v. Dickerson*, 470 U.S. 409, 411, 105 S. Ct. 1347, 1348 (1985).

(noting less stringent FELA standard of appellate review applicable to Jones Act cases). In *Roberts*, the Texas Supreme Court held that "a jury's verdict on liability issues in FELA cases, whether for the employer or employee, cannot be reviewed on appeal using local 'weight and sufficiency standards.'" 481 S.W.2d at 801. Once the appellate court determines that some evidence about which reasonable minds could differ supports the verdict, the appellate court's review is complete. *Id.* at 800; *see also Mason v. Southern Pac. Transp. Co.*, 892 S.W.2d 115, 118 (Tex. App.—Houston [1st Dist.] 1994, writ denied).

In reviewing the denial of a motion for judgment notwithstanding the verdict, we review the evidence in the light most favorable to the jury findings, considering only the evidence and inferences that support them, and disregarding all evidence and inferences to the contrary. *Navarette v. Temple Indep. Sch. Dist.*, 706 S.W.2d 308, 309 (Tex. 1986). If there is more than a scintilla of evidence to support the findings, the motion was properly denied. *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 227–28 (Tex. 1990).

## 2. *Analysis*

Appellant contends that appellees' evidence of causation was legally insufficient because they failed to prove that muddy conditions played a part—no matter how small—in bringing about Gutierrez's injury. In support of their contention, appellant argues that (1) Gutierrez admitted in the accident report that

working conditions did not cause him to fall; (2) the physical evidence proved that mud did not cause Gutierrez to fall; and (3) appellees built their case around incompetent evidence and speculative theories.

*(a)Accident Report*

At trial, appellant introduced the accident report that Gutierrez completed at the hospital. In response to the questions which asked how the accident occurred and the specific cause of the injury, Gutierrez wrote "[g]etting down [ladder] with hands and feet one step at a time, then having reached ground with both feet on ground I turned to go East and fell," and "[my] ankle gave way and I fell." Asked on the report whether working conditions caused or contributed to the cause of his accident, Gutierrez checked off the box indicating that they did not. Appellant argues that there is no evidence that Gutierrez told anyone that mud caused or contributed to his injury. Thus, it claims, appellees did not close the gap between their theory that Englewood Yard had a drainage problem and Gutierrez's injury.

Although it is undisputed that Gutierrez wrote on the report that his injury was caused by his ankle giving way after he had reached the ground, this evidence was not uncontradicted.[7] EMT Parker testified that when he arrived at the accident

---

[7]  Although appellant relies on the portion of Gutierrez's report stating that his injury was caused by his ankle giving way and that working conditions had not caused the accident as support for its theory of the case, it discounts his statement in the same report that he fell after descending the ladder, contending that he "did not admit that he had taken a prohibited shortcut."

11

scene, he found Gutierrez at the bottom of the ladder, that Gutierrez had told him that he had "slipped while climbing a ladder on a railcar," and that he had fallen a distance of "around four feet" and landed "on his feet." There was also evidence that Gutierrez had given the same account of the accident to his managers as well as to medical providers at the hospital. Additionally, Dr. Kress testified that the type of fracture Gutierrez sustained is most commonly the result of falling from a height, and that he had never seen that type of fracture pattern as a result of rolling one's ankle.

*(b) Physical Evidence*

Appellant next argues that the physical evidence itself indicates that the injury was not caused by muddy conditions. Specifically, Gutierrez's boots were mud-free when returned to his family, and the photographs Williamson and Lewis took after the fall showed no mud on the ground. Appellant further notes the testimony of Gutierrez's co-worker and managers that there was no mud in the area where Gutierrez had been working. Thus, it argues, the undisputed physical evidence conclusively proved that mud did not contribute to Gutierrez's accident. We disagree.

Evidence that Gutierrez's boots were mud-free when returned to his family does not prove that they were without mud when he fell. The jury heard testimony from Gutierrez's wife, Amelia, that while still in the hospital, her husband asked

12

her to tell their son, Adrian, to clean the boots "because they were full of mud." When Adrian pulled the boots from the hospital bag, however, he noticed they were already clean. Further, the testimony by Gutierrez's co-worker and managers that there was no mud in the area or on Gutierrez's boots was directly contradicted by EMT Parker's testimony as to mud on the boots, the area between the ambulance and the accident site, on the wheels and sheets of the gurney, and his need to hose off the mud from the gurney.

With regard to the mudless photographs taken by Williamson and Lewis, appellees argued at trial that the area between the tracks where Gutierrez worked had been altered after the injury but before the photos were taken. Three witnesses—two of Gutierrez's co-workers and a retired supervisor—testified that the ground conditions before his fall were different than those afterwards. Specifically, they testified that the area was cleaned up, leveled off, and much smoother after the accident. They further testified that within hours after Gutierrez's injury they witnessed a front-end loader dumping rocks between the tracks and smoothing out the road.

*(c) Appellees' Evidence*

Appellant also asserts that appellees' entire case is built upon incompetent evidence and speculative theories and, as such, a reasonable jury could not conclude that mud caused the injury. Specifically, appellant argues that Parker's

13

testimony did not establish that mud was the cause, and that appellees' theory of the case was nothing more than unsupported suspicion.

According to appellant, Parker's testimony as to mud on Gutierrez's boots and on the wheels and sheets of the gurney is legally insufficient evidence of causation because it was incompetent in light of the physical evidence. Appellant argues that Parker's memory, while "understandably hazy," could not be reconciled with the physical evidence in the case, i.e., the lack of mud on Gutierrez's boots and on the railcar. However, as previously noted, that Gutierrez's boots were mud-free when delivered to his family is not evidence that there was no mud on them at the time of the accident. Further, appellees' evidence of a decades-old drainage problem and resulting muddy conditions in the area, Gutierrez's fall from the ladder, and mud on his boots when he fell, comprises a body of evidence from which a reasonable jury could find liability.

Appellant also argues that appellees' theory required the jury to speculate and pile inference upon inference to conclude that mud played a part in Gutierrez's accident. It concludes that, in the absence of actual evidence that negligence caused Gutierrez's accident, the trial court erred when it denied appellant's motion for judgment notwithstanding the verdict.

With regard to whether a jury is permitted to draw multiple inferences to reach a finding of a causal connection in a FELA case, several United States

14

Supreme Court decisions prove instructive. In *Tennant v. Peoria & Pekin Union Railway Co.*, the plaintiff sued under FELA for the death of her husband during the course of his employment as a member of a switching crew in one of the defendant's railroad switching yards. 321 U.S. 29, 30, 64 S. Ct. 409, 410 (1944). The jury rendered a verdict in favor of the plaintiff but the appeals court reversed, concluding that although there was evidence of negligence by the defendant, there was no substantial proof that the negligence was the proximate cause of the employee's death. *See id.* In reaching its conclusion, the appellate court noted that the plaintiff's theory of the decedent's death, which required the jury to draw multiple inferences in order to support its inference as to causation, amounted to impermissible speculation. *See Tennant v. Peoria & Pekin Union Ry. Co.*, 134 F.2d 860, 868 (7th Cir. 1943), *rev'd*, 321 U.S. 29, 64 S. Ct. 409 (1944) ("This unreasonable inference, if accepted, to be of benefit to the plaintiff must be supplemented by the further inference, even more unreasonable, that the cause of the deceased's injury, as he stood in this known place of danger with knowledge that the engine was shortly to be moved in his direction, was defendant's failure to ring the bell as a warning.")

The Supreme Court reversed, concluding that the "[t]he *ultimate inference* that [the decedent] would not have been killed but for the failure to warn him is . . .

15

supportable." *Tennant*, 321 U.S. at 34, 64 S. Ct. at 412 (emphasis added). In so holding, the Court noted

> It is not the function of a court to search the record for conflicting circumstantial evidence in order to take the case away from the jury on a theory that the proof gives equal support to inconsistent and uncertain inferences. The focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury. It is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts. The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable. . . . That conclusion, whether it relates to negligence, causation or any other factual matter, cannot be ignored. Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable.

*Id.*

In *Lavender v. Kurn*, a switchman died after being struck in the head while operating a switch in the defendant's rail yard. 327 U.S. 645, 648, 66 S. Ct. 740, 742 (1946). The administrator of the decedent's estate sued under FELA and the jury rendered a verdict in favor of the plaintiff. *See id.* at 646–47, 66 S. Ct. at 741. The state supreme court reversed the judgment, however, holding that there was no substantial evidence of negligence to support submission of the case to the jury. *See id.* at 647, 66 S. Ct. at 741.

At trial, the parties presented conflicting theories of causation: the plaintiff asserted that the decedent was struck in the back of the head by a mail hook that

16

was protruding from the side of the mail car whereas the railroad claimed that he had been murdered. *See id.* at 649, 66 S. Ct. at 742. In order to accept the plaintiff's theory, the court noted that the jury first had to infer that the hook was sufficiently extended so as to reach the decedent and, assuming this fact, the jury then had to infer that the decedent had been standing on a dirt mound located near the track at just the right moment so that the hook would have struck him. *See Lavender v. Kurn*, 189 S.W.2d 253, 255–56 (Mo. 1945), *rev'd*, 327 U.S. 645, 66 S. Ct. 740 (1946).[8] Concluding that "it would be mere speculation and conjecture to say that [the decedent] was struck by the mail hook," the court held that there was insufficient evidence of negligence to warrant submission of the case to the jury. *Id.* at 259.

The Supreme Court reinstated the jury's verdict. *See Lavender*, 327 U.S. at 652, 66 S. Ct. at 743. The Court explained that even though the evidence tended to indicate that it was "physically and mathematically impossible for the hook to strike [the decedent]," this evidence was irrelevant upon appeal, since there was "a reasonable basis in the record for inferring that the hook struck [him]." *Id.* Responding to the Missouri Supreme Court's characterization of the plaintiff's evidence, the Court stated:

---

[8] The hook in question was affixed to the train at a height about a foot taller than the decedent. *See Lavender v. Kurn*, 189 S.W.2d at 254, *rev'd*, 327 U.S. 645, 66 S. Ct. 740 (1946).

17

It is no answer to say that the jury's verdict involved speculation and conjecture. Whenever facts are in dispute or the evidence is such that fair-minded men may draw different inferences, a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference. Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear. But where, as here, there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion. And the appellate court's function is exhausted when that evidentiary basis becomes apparent, it being immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable.

*Id.* at 653, 66 S. Ct. at 744.

These cases make clear that a jury may draw multiple reasonable inferences in order to reach its ultimate inference as to causation in a case brought under FELA. Appellees presented evidence of a longstanding drainage problem and generally muddy conditions at Englewood Yard, that the area in which Gutierrez worked was muddy on the day of the accident, that it had rained earlier in the morning of Gutierrez's shift, that there was mud on Gutierrez's boots, that he slipped and fell from the ladder, and that the nature of his injury was consistent with a fall from a height. When faced with alternative theories of causation, it is not our job to decide which theory is more plausible; instead, as long as there is an evidentiary basis to support the jury's conclusion, its verdict must stand. *See Lavender*, 327 U.S. at 652–53, 66 S. Ct. at 744; *see also Roberts v. So. Pac. Transp. Co.*, 44 S.W.3d 183, 187 (Tex. App.—Houston [14th Dist.] 2001, pet.

18

denied) (noting courts are not free in FELA cases to set aside jury verdict merely because inference are weak, one inference appears more reasonable than another, or same inference may support contrary conclusions); *St. Louis Sw. Ry. Co. v. Greene*, 552 S.W.2d 880, 883 (Tex. Civ. App.—Texarkana 1977, no writ) (stating it was jury's role to weigh credibility of witnesses, draw conclusions as to facts proved, and select inferences it considered most reasonable). Here, the jury chose to believe appellees' version of events. Having reviewed the evidence in the light most favorable to the jury findings, we conclude that there was a reasonable basis in the record for it to do so. As such, the trial court did not err in denying appellant's motion for judgment notwithstanding the verdict. *Culpepper*, 802 S.W.2d at 227–28. We overrule appellant's first issue.

## B. Jury Instruction

Appellant's second issue contends that the trial court erred by instructing the jury about the doctrine of assumption of the risk.[9] It argues that the instruction was not raised by the pleadings or evidence and was an improper comment on the weight of the evidence that likely tipped the scales in favor of appellees. Appellees

---

[9] The jury instruction stated as follows:

A railroad employee does not assume the risks of employment. A railroad employee is not negligent simply because he, upon the request or direction of the defendant, worked at a dangerous job, or in a dangerous place, or under dangerous conditions.

19

contend that the trial court's instruction was proper because appellant injected the issue of assumption of the risk into the trial and, thus, the instruction was necessary to avoid unfair prejudice that might result.

### 1. Applicable Law

Assumption of the risk is a common law doctrine that allowed an employer to escape liability for damages resulting from its negligence if its employee, by accepting or continuing his employment with notice of such negligence, "assumed the risk." *Tiller v. Atl. Coast Line R.R. Co.*, 318 U.S. 54, 69, 63 S. Ct. 444, 452 (1943) (Frankfurter, J., concurring). In 1939, Congress amended FELA to abolish the defense of assumption of the risk in cases brought under the Act. *Id.* at 58, 63 S. Ct. at 446. Although the defense has been eliminated, a trial court may nevertheless instruct a jury that assumption of the risk is not a defense if there are "facts strongly suggesting assumption of the risk." *Pyles v. Am. Trading & Prod. Corp.*, 372 F.2d 611, 614–15 (5th Cir. 1967).

We review the trial court's charge decision under the abuse of discretion standard. *Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990). The trial court has wide discretion in determining the sufficiency and appropriateness of definitions and instructions. *Plainsman Trading Co. v. Crews*, 898 S.W.2d 786, 791 (Tex. 1995).

### *2. Analysis*

Appellant argues that it neither pleaded nor argued the theory of assumption of the risk, nor could such an argument have been inferred from the evidence. Instead, it maintains that its position at trial was that Gutierrez's job was not dangerous when carmen maintain three-point contact on a ladder as Union Pacific's rules require, and called several witnesses who testified that they had never heard of any carmen falling from a ladder at the RIP track[10] at Englewood Yard. Appellant concludes that because it argued that Gutierrez's job was not dangerous, assumption of the risk was never implicated by the pleadings or the evidence.

Appellees, however, argue that appellant injected the issue of assumption of the risk by repeatedly telling the jury that Gutierrez had chosen to work the job on which he was injured, in the location where he was injured, and under the conditions existing at the time, despite there being no requirement for him to do so because his seniority allowed him to choose a different job. In support of their position, appellees point to several exchanges in voir dire during which appellant's counsel asked venire members how they responded to unsafe working conditions in their job, suggesting that stopping work in such conditions was "good sense" and assuming "personal responsibility." In opening statements, appellant's counsel

---

[10]     "RIP" stands for "repair, inspection, paint."

21

referred several times to Gutierrez's seniority, that it allowed him to bid on any job he wanted, and that he picked the RIP track because that was his preferred location. Appellees also point to co-workers' testimony elicited by appellant that Gutierrez chose to work the job on which he was injured, despite seniority that allowed him to choose any position.[11] Appellees argue that given these examples, and the fact that appellant claimed that Gutierrez had been contributorily negligent in causing his injury,[12] an instruction that assumption of the risk is not a defense was warranted.

As noted above, a trial court may instruct a jury that assumption of the risk is not a defense if there are "facts strongly suggesting assumption of the risk." *Pyles*, 372 F.2d at 614. Here, appellant's counsel reminded the jury numerous times—in voir dire, in opening statements, and through witness testimony—of the fact that Gutierrez's seniority allowed him to choose any job he wanted but that he had chosen the job and location where he worked. *See, e.g.*, *CSX Transp., Inc. v.*

---

[11] Appellant's counsel asked Willy Bilbo, Gutierrez's co-worker operating the car mover at the time of the accident, the following:

> Q: So, if Geronimo wanted to, he could have been the operator of the car mover?
> A: Yes.
> Q: But he gets to pick?
> A: Exactly.

[12] When evidence is adduced at trial implicating the doctrine of assumption of risk, the trial court must adequately distinguish conduct constituting contributory negligence from conduct covered by the doctrine of assumption of risk. *See* *Jenkins v. Union Pac. R.R. Co.*, 22 F.3d 206, 212 (9th Cir. 1994).

*Bickerstaff*, 978 A.2d 760, 782–83 (Md. Ct. Spec. App. 2013) (finding evidence introduced by defendants at trial regarding employee's choice of work or work site injected issue of assumption of risk into trial requiring an instruction); *Vandaveer v. Norfolk & W. Ry. Co.*, 222 N.E.2d 897, 906 (Ill. App. Ct. 1966) (finding evidence of employee's ability to request other jobs could have led jury to infer that employee assumed risks associated with current job and thus warranted instruction).

Further, we note that a defendant's intentions in presenting such evidence is not the proper focus; rather, it is the potential impact on the jury that governs whether an instruction is given. *See Jenkins v. Union Pac. R.R. Co.*, 22 F.3d 206, 212 (9th Cir. 1994) (concluding "[i]t is the evidence itself, not the defendant's characterization of it, that drives our analysis"); *see also Collins v. Nat'l R.R. Passenger Corp.*, 9 A.3d 56, 71 (Md. 2010) (concluding that "it is not purpose, but the impact of the evidence and argument of counsel on the fact finder that was and is at issue"); *Hamrock v. Consol. Rail Corp.*, 501 N.E.2d 1274, 1279 (Ill. App. Ct. 1986) (concluding instruction is properly given when issue of assumption of risk is expressly or implicitly before jury, even though not explicitly raised at trial). At the charge conference, the trial court expressed its concern regarding the potential impact of the evidence on the jury:

> [T]he defendant did bring out the point to the jury that Mr. Gutierrez
> had a lot of seniority. So, he could have chosen pretty much what he

did. And that was really emphasized in the case. And so, it worries me that the jury might say, well, he chose this particular job. And he really had his choice of jobs in the yard.

Given the evidence and counsel's arguments noted above, and in light of the trial court's wide discretion in determining the sufficiency and appropriateness of definitions and instructions, we conclude that the court did not abuse its discretion by instructing the jury on assumption of the risk. *Crews*, 898 S.W.2d at 791. We overrule appellant's second issue.

## Conclusion

We affirm the trial court's judgment.


Jim Sharp
Justice

Panel consists of Justices Jennings, Higley, and Sharp.