MARIAN OTT SEDERQUIST, Administratrix of the Estate of THEODORE O. SEDERQUIST, Deceased, Respondent, v. CHICAGO, ROCK ISLAND and PACIFIC RAILROAD COMPANY, a Corporation, Appellant, No. 43791—268 S. W. (2d) 861.

Division Two, June 14, 1954.

*Hale Houts* and *Hogsett, Houts & James* for appellant.

*Arthur C. Popham* and *Sam Mandell* for respondent; *Popham, Thompson, Popham, Mandell, Trusty & Green* of counsel.

■■■ ANDERSON, Special Judge—This is an action brought by Marian Ott Sederquist, Administratrix of the estate of her husband, Theodore O. Sederquist, deceased, against the Chicago, Rock Island and Pacific Railroad Company, to recover damages for the injury to and death of her husband who was killed while employed by the defendant as a locomotive fireman. Suit was brought under the Federal Employers' Liability Act, 45 U.S.C.A., Sec. 51, et seq., the petition charging a violation of the Boiler Inspection Act, 45 U.S.C.A., Sec. 22 et seq. The petition was in two counts— Count I seeking damages for her husband's death, and Count II praying damages for the conscious pain and suffering which decedent experienced prior to his death.

At the close of plaintiff's case the court directed a verdict for the defendant on Count II of the petition. Count I was submitted to the jury and a verdict returned in favor of plaintiff for $52,000. Thereafter, defendant filed a motion for judgment in accordance with its motion for a directed verdict at the close of all the evidence or, in the alternative, for a new trial. The court thereafter ruled that a new trial would be granted unless plaintiff would remit from said verdict the sum of $12,000. Such remittitur was made, and the court entered judgment in the amount of $40,000 in favor of plaintiff on Count I of the petition. From the judgment, defendant has appealed.

The sole contention urged for reversal is that the evidence adduced was insufficient to support an inference that the fatal accident resulted in whole or in part from a violation by defendant of the Boiler Inspection Act, as alleged in the petition and submitted by plaintiff's principal instruction, and that therefore the trial court [863] erred in deny-

ing defendant's motion for a directed verdict. The relief prayed is a reversal of the judgment and for an order directing the trial court to enter judgment for defendant in accordance with its motion for a directed verdict.

Deceased was the fireman on defendant's transcontinental passenger train known as the "Imperial". Joseph Ebeck was its engineer. The train started its run at Chicago and arrived in Kansas City on August 3, 1950. The train consisted of seventeen or nineteen cars, pulled by three Diesel engines. Upon arrival at Kansas City one of these Diesel units was detached from the train due to some mechanical defect, and the train proceeded out of Kansas City with the two remaining units. These units were coupled together and controlled from the cab of the front locomotive. Deceased and Ebeck went on duty at Kansas City. Under the operating rules of defendant, the fireman in the performance of his duties is under the direction of the engineer. The train left Kansas City forty-five minutes late, and as it proceeded westward the engines were worked at full capacity in order to regain time. From Kansas City to McFarland, Kansas, which is about one hundred miles west of Kansas City, the territory through which defendant's road runs is practically level. After leaving McFarland there are a series of grades. Any heating of the engines on this division usually happens in this hill country. As the train proceeded, deceased made about four trips to the rear unit to check it and to ascertain whether the engine was functioning properly or "heating". On each occasion he came back and reported to the engineer that "she is all right". When the train was near Volland, Kansas, which is 120 miles west of Kansas City, deceased, with the permission of Ebeck, again went into the rear unit for the stated purpose of checking the locomotive. Leaving Volland, defendant's road runs on a slight upgrade for about three miles, then enters steeper grades which are as much as one per cent. There are several curves in this area. After deceased had been gone for ten or fifteen minutes Ebeck became concerned about him, stopped the train, and went back to look for him. Ebeck found deceased sitting on the floor of the passageway of the rear locomotive with his head down and leaning against the side of the unit. There was a bruise on deceased's head and blood was running down his cheek. Sederquist made no statement at the time, and Ebeck did not try to talk to him for the reason that deceased looked to be in "bad shape". Ebeck pulled him away from the boiler and placed him in a comfortable position. By that time the conductor and brakeman had arrived and it was decided to proceed to Herington, twenty-five miles distant, where deceased could secure proper medical attention. The conductor then returned to his post to make out a message to be sent ahead, and Ebeck returned to the operating cab and took the train into Herington. The brakeman remained with Mr. Sederquist. The brakeman did not testify at the trial. The trip to Herington took about thirty minutes. At Herington, deceased was

removed to a hospital, where he died about three hours later. Deceased suffered a skull fracture. It was admitted that deceased died as a result of the injuries received that morning.

There was a ventilating system in the locomotive in question consisting of water cooling radiators and fans. This ventilating system was located in a separate compartment above the ceiling of the passageway where deceased was found after the accident. This false ceiling was about six and one-half feet above the floor of the unit. It was about ten and one-half feet from the floor of the unit to the very top of the ventilating compartment. Located in the false ceiling above the passageway was an opening, oblong in shape, which afforded access to the space above. It was about 14 by 18 inches in size. This opening was covered by a metal lid referred to by the witnesses as a "hatch cover", which was made of light weight steel, and was approximately one inch larger in diameter than the opening in the ceiling. The lid had four bolts with wing nuts to hold it in █ place. To remove the lid it was necessary to unscrew the wing nuts, push upward on the hatch cover, turn it, and then bring it down through the opening. The wing nuts would come off the bolts when turned with the finger and thumb, but the bolts would remain in place.

Mr. Ebeck found Mr. Sederquist directly under the hatch. Near Sederquist was the hatch cover. There were no dents or marks on the hatch cover. Later, at Herington, a broken fan blade and an iron pipe some thirty inches long were discovered by Mr. Ebeck on the floor near the place where deceased was found. There was no testimony as to where the wing nuts were at the time.

The broken fan blade was from a ventilating fan located in the compartment above the false ceiling. The edge of this fan was about two feet from the hatch. It was about 26 inches in diameter. The fan blade was made of cast aluminum and weighed about a pound and three-quarters or two pounds. Later, two other fan blades from this fan were found in the ventilating compartment above the false ceiling.

The pipe which was found near deceased was hollow, about thirty-six inches in length, and one and one-half inches in diameter. It weighed approximately seven pounds. It was not standard equipment for Diesel units, and neither the engineer nor the fireman had any use for it in the performance of their duties. Defendant's witness and road foreman, Guinn, who inspected the rear locomotive at Herington after removal of the deceased to the hospital, testified that the pipe had a slight bend in the middle, and an indentation on one end. Ebeck testified that before leaving Kansas City he inspected the rear locomotive but did not see this pipe which he later found. He also stated that deceased did not have this pipe in his hands when he left the cab to make his inspection prior to his injury.

The pipe was of the kind that could be used by a mechanic to put over a wrench to secure additional leverage. Its presence on the locomotive in question was unexplained. The witnesses testified that prior to the

discovery of the pipe in the passageway it could have been concealed in one of the channel irons which form the framework of the locomotive.

It was possible for the iron pipe to have been located in the ventilating compartment prior to the accident according to J. W. Gann, defendant's master mechanic who testified for defendant. However, defendant's witness Guinn stated that he did not think there was sufficient room there for the pipe. He further testified that he did not believe the pipe had been in the upper compartment for the reason that when found it was free from dirt, oil and grease—the evidence showing that above the hatch there was an accumulation of these substances.

Deceased had on gloves at the time he was found. These gloves had grease on them. Ebeck testified that "When I went to where Mr. Sederquist was he had some oily dust over his face and head and body."

As heretofore stated, the dimensions of the hatch were 14 by 18 inches, and it was about six and one-half feet from the floor. Deceased was six feet, one and one-half inches tall, and weighed about 225 pounds. Ebeck testified:

"Q. It isn't anybody's duty to try to take that covering off and get up there while the train is running, is it? A. No, sir.

"Q. As a matter of fact, you and Mr. Sederquist aren't supposed to go up there at all, are you? A. No, sir.

"Q. That is not your job? A. No, sir."

On the roof of the locomotive were ten air scoops, designed to provide air to the cooling system. In normal position these scoops are set with their openings facing the direction the unit is moving. There was one scoop located over the fan here involved, and on the occasion in question it was setting backwards. They may be set either way. The scoops are supposed ▉ to be set by the shop mechanics before the train leaves the terminal. It was no duty of the fireman to change the direction of these scoops. To do so one would be required to go on top of the unit, which would not be attempted when the train was running at high speed.

Defendant's witnesses testified that the air scoops, and the direction in which they were turned, made little if any difference in the cooling of the engines. They also testified that they had been found unnecessary and have now been removed from all of defendant's Diesel units.

There are four cooling fans on each unit; also shutters on the sides of the unit which bring in air. Ebeck testified: "The shutters are operated by air cylinders, and wherever we have any equipment we might have mechanical defects that do develop, and if a shutter would fail to open and it was detected in proper time it could be opened manually and avoid overheating the engine. That is why we check the condition of the engine, to avoid trouble before it occurs."

Ebeck testified that there was no overheating of the engines in either locomotive on the entire run from Kansas City to Herington. He stated that if the engine in the second locomotive had run hot he would have

been apprised of it by an alarm bell located close to his cab, and by lights which would have gone on in the engine room. Nothing like that occurred. Defendant's witness Guinn, who inspected the locomotive at Herington, said that the engines were not overheated on arrival there. Gann, defendant's master mechanic, testified that he found no indication that the engines had been overheated.

Ebeck gave the following testimony relative to his inspection of the unit before leaving Kansas City:—

"Q. * * * Tell the jury when you went back there into this rear locomotive before you left Kansas City if you observed the floor and the machinery and the gauges and the valves and the various parts of it as you usually do in starting out on a trip? A. Yes, sir, and everything was in a normal condition.

"Q. A pipe has been referred to here, said to be about 30 inches long, a metal pipe. When you went back there before you left Kansas City and made this inspection and examined the floor and the valves and parts of the rear locomotive, did you see any pipe of any kind laying on the floor anywhere in sight? A. No, sir."

Ebeck further testified:

"Q. * * * It isn't anybody's duty to try to take that covering off and get up in there while the train is running, is it? A. No, sir.

"Q. As a matter of fact, you and Mr. Sederquist aren't supposed to go up in there at all, are you? A. No, sir.

"Q. That is not your job? A. No, sir."

Appellant contends that its motion for a directed verdict should have been sustained for the reasons: (1) there was no substantial evidence of the breach by defendant of any duty it owed deceased under the Boiler Inspection Act; and (2) the only reasonable inference that could be drawn from the evidence is that the sole proximate cause of the accident was the negligence of deceased while performing acts beyond the scope of his employment. In considering said assignments we must consider the evidence from a standpoint favorable to plaintiff.

Taken in its most favorable aspect to plaintiff's case, the evidence tended to show that the train in question left Kansas City forty-five minutes late. One of the locomotives had been taken off at Kansas City, and the two remaining Diesel units were being worked to full capacity. Both Ebeck and deceased were apprehensive that the rear engine would become overheated. So great was their concern that deceased made four trips to inspect the rear locomotive during the trip from Kansas City to McFarland, Kansas, a distance of about one hundred miles. It was a part of Sederquist's duty to make these inspections.

Shortly after the train passed Volland, Kansas, deceased, with the approval of his superior, Ebeck, again entered the rear locomotive for the purpose of ascertaining whether its engine was overheating. About

fifteen minutes later Ebeck found Sederquist injured in the passageway of the rear locomotive. Lying beside Sederquist was a broken blade from a fan located in the ventilating compartment. The ''hatch cover'' located in the ceiling was removed and was lying on the floor beside deceased. Deceased had a bruise in his head and there was blood running down his face. There was also a hollow iron pipe found lying beside deceased. This pipe was clean and free from oil or grease. Deceased, when found, had on gloves which were greasy.

The ventilating or cooling system was located in a separate compartment above the ceiling of the passageway where deceased was found. If this cooling system failed to operate properly it would cause the engine to overheat.

Sederquist died as a result of the injury sustained on the occasion in question.

The foregoing facts are not disputed.

It is our opinion that the above facts furnish an evidentiary basis for a finding that defendant breached its duty to deceased under the Boiler Inspection Act. Banta v. Union Pacific R. Co., 362 Mo. 421, 242 S.W. 2d 34; Lilly v. Grand Trunk Western R. Co., 317 U.S. 481, 63 S.Ct. 347; Lavender v. Kurn, 327 U.S. 645, 66 S.Ct. 740; Urie v. Thompson, 337 U.S. 163, 69 S.Ct. 1018.

Under the evidence the jury could reasonably find that deceased was actually engaged in the performance of his duties at the time he was injured. He had gone to inspect the rear engine to ascertain if it was overheating, and was found injured in a place where it would reasonably be expected that he would be in the performance of his duties. It may be presumed that deceased at the time was exercising due care for his own safety. While thus engaged he was struck and injured by a fan blade which was hurled from the fan located above the ceiling. Fans do not ordinarily fall apart when they are in safe condition, and a finding in this case that the fan was not in proper condition and was unsafe to operate would be justified, unless we find that the evidence supports appellant's contention that the disintegration of the fan was caused by the sole negligence of the deceased.

Appellant, in support of its contention, states in its brief: ''It thus appears from plaintiff's own evidence that deceased himself must have unscrewed the wing nuts that fastened the hatch cover over the opening and pushed up the hatch cover and tilted the hatch cover, in order for it to have reached the floor, where it was found after the accident. Plaintiff's own evidence also at least suggests that deceased himself stuck the pipe up into the ventilating compartment and into contact with the fan so as to break some of the blades, including the one Ebeck found on the floor near him after the accident.''

Appellant's theory that deceased removed the hatch cover is based upon the following considerations: (1) when deceased and Ebeck

inspected the train in Kansas City they found the locomotive and all equipment in good order; (2) no one except deceased thereafter entered the second locomotive; and (3) that because of the way the hatch cover was made and secured to the ceiling it could not have been displaced or removed except by human agency.

We cannot agree that the facts supporting appellant's theory were conclusively established. Let us first consider the question as to whether or not deceased removed the hatch cover, and the effect such a finding would have upon plaintiff's right to recover.

The fallacy of appellant's reasoning is made clear when the record is examined. The only testimony with reference to the nature of the Kansas City inspection was given by Ebeck. This testimony has heretofore been set out. The witness was questioned relative to any observation he made with reference to the floor, machinery, gauges, and valves. The witness replied that everything was in normal condition. No specific inquiry was made with reference to the hatch cover or ceiling. We therefore do not believe that the testimony of this witness conclusively established that the hatch cover was in place and bolted down at the time in question. It might have been removed and lying above the ceiling, away from the opening, as far as the evidence in this case is concerned; and the failure to account for the wing nuts would seem to lend color to such hypothesis. But, be that as it may, under the facts in this case, plaintiff would not be precluded from recovery even though it did appear that deceased removed the hatch cover.

Both Ebeck and deceased were concerned that the engine on the second locomotive might overheat, and deceased in the performance of his duties went to the rear locomotive to ascertain if such were the case. The ventilating or cooling system was located in the compartment above the hatchway. If the fans were for some reason not running, or any of the shutters not open, the engine would become overheated. Thus, could it be said that deceased had departed from his line of duty if he removed the hatch cover in order that he might see if the conditions were normal and the fans operating? We think not. Under the circumstances, it would not be a departure from Sederquist's line of duty to remove the hatch cover, even though he was not instructed to do so by his superior, Ebeck.

Where the circumstances are such as to justify a man of ordinary prudence in regarding the thing he does as a part of his duty, the servant will be deemed to be acting within the scope of his duty. It is not expected or required that a foreman shall direct each specific act of the servant. On the contrary, the latter is allowed to use his own initiative and intelligence, provided his act is reasonably related to his duties, and not a departure from his employment. Louisville & N. R. Co. v. Hays' Admr., 128 S.W. 289.

Other facts are stressed by appellant as proving its theory. It is pointed out that the condition of the pipe showed that it could not

have been in the ventilating compartment prior to the accident. It is also stated that the indentation and marks on the pipe indicate that it had come in collision with the fan, which contact could only have been accomplished by the deceased deliberately thrusting the pipe through the opening into the fan. We will not say that a jury might not draw such inference. All that is necessary for us to decide is that it was not a necessary inference. It clearly was not, especially in view of the fact that it would be a very foolish thing for deceased to do, and the further fact that the pipe was free of oil and grease when found— the evidence showing that Sederquist when found had on gloves which were greasy. It is also significant that the record fails to show whether or not these marks on the pipe were fresh marks.

It is possible that the pipe in question played no part in this accident. It was no part of the standard equipment of this locomotive, and Sederquist had no duties to perform which required its use. It could have been concealed in one of the channel irons when Ebeck made his inspection at Kansas City, and later jarred from that position onto the floor of the passageway when the train rounded one of the curves in the vicinity of Volland. In such a case, its presence near deceased would be a mere coincidence.

It is our belief that whether the death of Sederquist was due to his own sole negligence or was caused by defendant's violation of the Boiler Inspection Act was a question for the jury. The jury resolved the issues in favor of plaintiff. There was substantial evidence in our opinion to support the jury's finding. Such being the case, we are not authorized to disturb the verdict. Lavender v. Kurn, 327 U.S. 645, 66 S.Ct. 740; Tennant v. Peoria & Pekin Union R. Co., 321 U.S. 29, 64 S.Ct. 409.

The judgment is affirmed.

*Leedy*, Acting P. J., and *Broaddus*, Special Judge, concur.