1. There was sufficient evidence to authorize the verdict.
2. Although the evidence for the plaintiff contained contradictions, there was no abuse of discretion in denying a new trial, based solely on the general grounds. Clemons v. State, 159 Ga. 425 (125 S.E. 800).
 DECIDED DECEMBER 4, 1946.
This is a suit for damages by H. Z. Gardner against Western and Atlantic Railroad Company on account of alleged negligence: "(a) In causing said [railroad] cars to lurch forward *Page 600 
with a quick, sudden, violent, unusual, and unnecessary jerk as petitioner was alighting therefrom as herein alleged; (b) in not gradually slowing said cars down so petitioner could dismount from same at said time and place; (c) in not warning petitioner of its intention to make said lurch in the movement of the train, so that he would not attempt to alight therefrom while performing his duties at said time and place as herein alleged."
The action was by an employee of the railroad company against the company under the Federal Employer's Liability Act to recover damages for the infliction of a personal injury. The defendant denies being guilty of any negligence, and contends that, if the plaintiff was injured at the time and place alleged, such injury was due to and was the result of his own negligence solely, and that the inguinal hernias of the plaintiff were congenital and were brought about through no fault or negligence of the defendant Western and Atlantic Railroad. The jury found a verdict for the plaintiff in the sum of $628.91. The defendant moved for a new trial, which motion was overruled, and he excepted.
The only testimony for the plaintiff was that of the plaintiff himself, H. Z. Gardner, who testified in part: "I am forty-six years old. I am employed by the N.C. St. L. Railroad, and have been so employed since March of 1944, in the capacity of a brakeman. As a brakeman I run from Atlanta, Georgia, to Chattanooga, Tennessee. I haven't lost any time since I have been with this road, except when I was off hurt." He stated that on the day he was injured he was the head brakeman on a freight train of said company traveling from Chattanooga to Atlanta. As such brakeman on said freight train, "my duties required me to cut switches, follow the engine, cut loose cars and connect them, swinging on and off . . and it was necessary for me to swing on and off the cars that day on this train." He testified further that it was necessary for him to swing on and off the cars while switching in Marietta at the time he was injured on August 26, 1944. He stated that this is what happened when he was injured: "I cut loose the train and came down to the switch and threw the switch, and had backed up into the long track, and gave the engineer the signal to pull out to throw these cars back on the train, and when I was coming out there I was swinging on the side of the car with the grapiron, and just as I got to the switch to swing off and to let the other *Page 601 
cars pass so that I could line the switch back to the main line, he gave a hard jerk, the engineer did, just as I was stepping off the train on the ground, and it caused me to hit the ground hard. Something happened to me at that time; I felt a hurting right after that in my groins down here. I continued working though, and worked on into Atlanta. I did say something to somebody about getting hurt along about that time; I said something to the engineer after we headed in at Rosewood, a sidetrack just below the station down there; we headed in there and stopped, and I told him I hadn't had anything to eat since we left Chattanooga, and I reckoned it was hunger pains, and I told him my stomach was hurting me, and he raised up his box there and got some crackers and gave me something to eat. I felt this hurting in my groins there almost immediately after I left the train, but I didn't know what it was, I thought it was hunger pains because I had been on duty so long. I did have pains right after that. And the engineer says, `I have got some crackers here in the seat,' and he reached in there and got them. I said we had left Chattanooga somewhere around ten o'clock on the night of August 25th, and we were here in Marietta the next morning between eight and nine o'clock. I hadn't had anything to eat from the time we left Chattanooga until we got here in Marietta. And so I thought these pains I suffered there at that time were hunger pains. Then when I got to Atlanta I went on and put my engine up, and then I went on home and went to bed. I did not know at that time that I had a hernia. It is still paining me down there. This was on a Saturday. Then on the next day [after the accident], Sunday, I just laid around. While I was laying down I didn't have any pains then, I was practically easy when I was laying down, and that was the reason I laid down. I laid down off and on all that day, I was up and down. Then on the next day, on Monday, after this occurred on Saturday, I saw a doctor. I went to see my doctor, Dr. Shackleford, and he made an examination of me at that time. I had made an examination of myself before I went to him, and I had found a knot on my side Sunday afternoon [the next day after the accident], it was hurting me so bad. That knot was on my right side, right in there (indicating). Prior to this time that I stepped off of this car here, that I was talking about, I did not have any hernia, nor did I have any knot in my side. I had never been ruptured *Page 602 
before. When I went to work for this railroad in March of 1944 I was subjected to a physical examination. The doctor that made that physical examination was Dr. Persons, the railroad doctor or physician. He passed me at that time as being fit for brakeman's service, and I was employed after that. This jerk now that I was talking about when I went to step off of the guard there, that was just a jerk, a lunge forward, like that. It was not an easy kind of a jerk. As to what the difference was between it and the ordinary jerks — well, it was just harder, and it caught me right in the act of stepping off too. There was no reason at all for making that jerk. And when my feet came in contact with the ground they hit the ground hard. I am forty-six years old now, but I was forty-five years old at that time. After I was examined by Dr. Shackleford, my family physician, on Monday [two days after the accident], he then sent me to the railroad; he told me I could work like I was, and that I would have to have an operation, and then I went to the railroad office. That was out at Hills Park, in Fulton County, and I saw Mr. Phillips out there, the train master, there in his office. I told him that I had been to see my family physician, and I told him what my family physician had said. Mr. Phillips then sent me to Doctor Ward, the railroad doctor, and Doctor Ward then made an examination of me. After he made his examination of me, I then went to the hospital. Doctor Ward told me that I had a hernia, and I went to the Emory University Hospital, where Doctor Ward performed an operation on me, in fact two operations. Those operations were not performed the same day, but one of them was on the 13th, and the other one was on the 29th, two different operations. I was in the hospital from that for thirty-one days. I went back to work for the railroad after that. I think that condition was cured by the operation. I went back to work on the 13th of December, I think it was. From the time that I was injured on the 26th of August, 1944, until I went back to work I lost 108 days from my work. My average day's work paid me $9.54 a day; and as I said, I lost 108 days. That $9.54 a day did not include anything for overtime. And on these runs that I was on the regular schedule was 10 hours and 33 minutes. That is what constitutes the $9.54; and then for any time I worked over that, I was paid extra for that. These injuries that I received there did cause me to suffer pain, and I continued to suffer pain *Page 603 
from this up until just before I went back to work. I suffered a whole lot of pain. I suffered pain attending the operations that I had. I did not know, and I was not warned by any one, that this lurch was going to take place in that train before I started to get off. In swinging off of those cars when we were making the movements around at the different stations where we were switching, my duties required me to do that. And on this day that I was injured, I was getting off in my usual and customary manner."
The special grounds of the motion for new trial are but an elaboration of the general grounds. Hence, the sole question for our determination is, did the evidence authorize the verdict.
In Lavender v. Kurn, 327 U.S. 645 (66 Sup. Ct. 740,90 L.ed. 692), which was an action under the Federal Employers' Liability Act, it was said: "In action under Federal Employers' Liability Act for death of railroad switch tender, where there was reasonable basis in evidence for inferring that mail hook swinging from side of mail car struck deceased and jury made that inference, factual dispute could not be relitigated in reviewing court and fact that there was evidence tending to show that it was physically and mathematically impossible for hook to strike deceased and showing facts from which it might reasonably be inferred that deceased was murdered was irrelevant on appeal." It was further stated that, "Where there is reasonable basis in record for jury's verdict, appellate court may not weigh conflicting evidence, judge the credibility of witnesses and arrive at a conclusion opposite from the one reached by the jury."
We think that there was a reasonable basis in the evidence of the plaintiff upon which to rest an inference upon a premise of fact, and thus to authorize the jury to infer that the negligence of the railroad company was the proximate cause of the plaintiff's injury. In short we think that the testimony of the plaintiff furnished a reasonable basis for the verdict of the jury. Williams v. Paul F. Beich Co., 74 Ga. App. 429 (40 S.E.2d 92).
"A jury in arriving at a conclusion upon disputed issues of fact may believe a part of the testimony of a witness or witnesses, and reject another part thereof, it being their duty to ascertain the *Page 604 
truth of the case from the opinion they entertain of all the evidence submitted for their consideration." Sappington v.Bell, 115 Ga. 856 (42 S.E. 233).
The testimony of the engineer, conductor, fireman, and other witnesses for the railroad company relative to the jerking of the train and to certain statements of the plaintiff were at variance with the testimony of the plaintiff. However, the jury being the sole judges of the credibility of the witnesses were authorized to accept the testimony of the plaintiff in preference to that of the defendant's witnesses. Waters v. Guile, 234 Fed. 532 (6-7).
"`The opinion of an expert witness is not conclusive upon the jury. Such testimony is intended to aid them in coming to a correct conclusion upon the subject; but the jury is not bound by such opinion, and can disregard it. The jury may deal with such testimony as they see fit, giving credence to it or not.'" OceanAccident Guarantee Corp. v. Lane, 64 Ga. App. 149 (12 S.E.2d 413).
The local surgeon for the Western Atlantic Railroad testified: That "I recall, back in August of last year, making an examination of Mr. H. Z. Gardner, the plaintiff in this case. He was sent to me by a representative of the Western Atlantic Railroad. My examination of him was on August 28th. My examination at that time disclosed he had a bilateral hernia or hernias, one on the right and one on the left . . in the inguinal region. . . I performed that operation, one on each side. I performed one operation on him last September 13th, when I did the right side, and then on the 29th I did the left side. . . It is my opinion these hernias were the result of congenital defect. The term congenital means something you are born with. In my experience I have operated on and repaired a good many inguinal hernias. And from my experience with inguinal hernias and from my examination of Mr. Gardner I say it is my opinion that his were congenital, or that he was born with a weakness there, and not as the result of any strain, or sprain, or jolt. In my experience I have not found any one born with normal structure who had a hernia. . . I said I had never seen a hernia that I thought resulted from a strain or jerk or jolt. Hernias are caused by congenital weakness of structure together with a protrusion of the lining of the abdominal wall out through the inguinal ring; that is generally accepted *Page 605 
in medicine and surgery, in practically all inguinal hernias. As to why it did not appear on this man prior to the time it did, if it did not result from a strain or jerk or jolt — well, it just has to appear some time, and it might have appeared while he was walking down the street, or any other time. . . Hernia is the medical name for such a condition as that, and a lot of people call it rupture, which is just another expression for it."
Under the rule above stated, the jury is not bound by such expert testimony and opinions of the doctor and can disregard it. They seem to have exercised this right and disregarded his expert opinion, and the plaintiff's testimony authorized the verdict. Although his testimony contained some contradictions, there was no abuse of discretion in denying a new trial.
This case was considered and decided by the whole court, as provided by the act approved March 8, 1945, requiring that the full court pass upon cases in which there is a dissent.
Judgment affirmed. Sutton, P. J., Felton, Gardner, andParker, JJ., concur. Broyles, C. J., dissents.