### McGURTY v. TRANSCONTINENTAL & WESTERN AIR, Inc.
### No. 9350.

Circuit Court of Appeals, Seventh Circuit.

April 16, 1948.

while a passenger for hire on defendant's airplane on October 25, 1944. The complaint was first filed in an Illinois State court, and on motion of defendant, the cause was removed to the District Court of the United States for the Northern District of Illinois. The complaint alleges that plaintiff was without fault contributing to such injuries, and that they were proximately caused by defendant's acts of negligence, as follows:

1. The defendant, through its agents and servants caused said plane to give a sudden and violent lurch without warning to the plaintiff;

2. The defendant carelessly and negligently allowed the door of the airplane to remain open while it was in motion, and failed to warn plaintiff of said condition, and failed to properly protect plaintiff from the dangers incident to such condition;

3. The defendant, through its agents and servants failed to maintain said airplane in proper and sufficient manner.

The issues were joined by an answer denying the alleged acts of defendant's negligence, and asserting that plaintiff's negligence contributed to his injury. At the conclusion of plaintiff's evidence the defendant moved to strike all the evidence theretofore given, and also moved the court to instruct the jury to find the defendant not guilty. These motions were overruled and the cause was submitted to the jury which returned its verdict in favor of the plaintiff. Subsequently, the defendant moved the court to enter a judgment in its favor notwithstanding the verdict, and in the alternative for a new trial. The court overruled such motions and entered judgment on the verdict for the plaintiff. This appeal is prosecuted from that judgment, and from the order thereafter entered denying defendant's motion for judgment notwithstanding the verdict and in the alternative for a new trial.

The contested issues here presented were:

(1). Whether the trial court erred in denying the defendant's motion for directed verdict at the close of all the evidence;

A. R. Peterson, Owen Rall and Walter W. Ross, Jr., all of Chicago, Ill. (Walter P. Steffen and Eckert & Peterson, both of Chicago, Ill., of counsel), for appellant.

Donald N. Clausen, Herbert W. Hirsh, Norman A. Miller and John P. Gorman, all of Chicago, Ill., for appellee.

Before SPARKS, MAJOR and MINTON, Circuit Judges.

SPARKS, Circuit Judge.

Plaintiff sued defendant for damages alleged to have been sustained by him

(2). Whether the trial court erred in denying defendant's motion for a judgment notwithstanding the verdict, or for a new trial.

Plaintiff had boarded this plane at Albuquerque, New Mexico, enroute to Chicago, at about 3:30 P.M. The plane was a twin-engine, low wing, twenty-one passenger DC-3 airplane built by Douglas. It had a wing spread of 95 feet and the fuselage was about 65 feet long. Its weight was approximately between 23,000 and 24,000 pounds. It was carrying a full load of twenty-one passengers, plus the pilot, co-pilot and hostess. There were eighteen servicemen and three civilians among the passengers, one of whom was a woman.

The cockpit, in which the pilot and co-pilot operated the plane, was in the front portion of the cabin of the plane. Immediately to the rear of the cockpit the cabin for passengers was located. To the rear of this were a baggage and mail compartment and toilet facilities.

The cabin or passenger door way was located toward the rear on the right side of the plane. The distance between the back edge of the wing, where it joined the fuselage of the plane, and this door was 8 feet and 10 inches. The distance from the front landing gear to the cabin door was about 21 feet 10 inches. The passenger doorway, which was oval in shape, was about 5 feet high and between 2 feet 4 inches and 2 feet 7 inches wide. There was a handle about 8 inches wide on each side of the door, not quite half way between the floor and the top of the door. The door was approximately 4 feet from the ground.

Plaintiff entered this plane by the passenger door by the use of movable steps and platform. Inside the cabin there were seven single seats on the right side of the aisle and seven double seats on the left side. Plaintiff was assigned the third one of the single seats on the right-hand side. The plane first flew to Amarillo, Texas, where plaintiff and others of the passengers left the plane temporarily by the use of platform and steps similar to those used when they first boarded the plane. He re-entered the plane by the same means, the flight continued, and dinner was served the passengers.

Shortly after the plane passed over Gage, Oklahoma, the right engine developed trouble. It started to backfire and the oil pressure fell below safe operating limits, and the plane, by orders of defendant, was returned to Gage. Here there was a Civil Aeronautics Administration emergency landing field which was also used by the United States Army for training purposes. This field had two paved landing strips, each 5500 feet in length, one running north and south and the other northeast and southwest. The crew, after contacting the airline's flight superintendent by radio and the government radio station at Gage, received instructions to land south and to taxi toward the port. After locating the strip, which was about three quarters of the way toward the south end of the field, a successful landing was made and an attempt was also made to taxi the plane along the runway on the good engine, but it was impossible to do so.

The crew was informed that there was no tractor available for moving the plane on the ground and that they must remove it from the runway in order to avoid any other planes which were liable to land at any time, whereupon the pilot, when the plane landed, went back into the cabin and stated to the passengers: "Men, you will have to give me a lift," or, "You will have to help me." He stated that he said: "This is as far as we will go. We would like to have some help in pushing the airplane off the runway. Will you give us a hand?" He then returned to the cockpit and the co-pilot came out, went to the back of the plane and opened the passenger door and jumped out of the plane. He then stood on the ground outside the door. The plane was not carrying any platform steps for unloading passengers and that landing field did not have such a platform.

Thereupon, the eighteen servicemen got out of the plane and as each jumped out the co-pilot warned him of the distance to the ground and asked each of them to be careful. He used a lighted flashlight which he pointed at the ground as the

servicemen alighted. The co-pilot then closed the door. None of the three civilians got out of the plane at this time. Very shortly afterward one of them, Doctor Seibel, left the plane, leaving the door open when he got off. He realized that at that time it was some distance down to the ground and that the plane was in motion. He said that he got off the plane while it was in motion and then went to help push. Plaintiff testified that when the pilot asked for help to push the plane off the runway, he, plaintiff, had his safety belt around his waist and the tray with his unfinished dinner on his lap, and that after such request the servicemen began to leave the plane; that after some difficulty in adjusting his safety belt and in handling the tray, he got up and walked to the stewardess, who was seated in the rear left-hand side of the plane, approximately opposite the door; that when he stood up all the men had left the plane and there was no one left but the one woman passenger and the stewardess; that he did not see Doctor Seibel get off the plane; that after all the other men had gotten off he decided he would get off the plane and assist in pushing; and that after handing the tray to the stewardess he turned away from her and toward the door, and that he did not speak to her nor did she speak to him.

On direct examination plaintiff testified that it was about one minute between the time the last man left the plane and the time that he got off. He also said that as he walked toward the door he felt no sense of motion and that the door was open at about a 45 degree angle. From where the hostess was when he handed her the tray he took two steps to reach the door. The plane was lighted and he put his left hand up against the wall on the inside of the plane; he was touching the wall lightly with the fingers of his left hand and at that time his right hand was at his side not touching any part of the plane. At that time it was semi-dark outside and he could not see anything clearly; there was only the illumination from the plane but he could not see any lights from the plane outside, at least he did not notice any. He said that he looked down but could not tell whether there was a platform there or not; that while in that position he put his right foot out to feel for a platform, and that he did not see anyone standing in the vicinity on the ground and did not hear anyone; that he knew all the passengers were out there somewhere; that he did not call out to them nor see them, and he heard nothing.

Plaintiff did not call out and inquire of anyone as to whether there was a loading platform. He did not ask the hostess if there was one; he did not look for the handles that were on either side of the door, and after he determined that there was no platform he decided to stay on the plane. He released his left hand for a moment and just at that instant there was a lurch, or shock, which unbalanced him; both of his hands shot out, and the next thing he knew he was on the ground.

On cross examination he stated that he had no sense of motion at that time and there was nothing to warn him that the plane was in motion. He did not see the ground below the plane; he did not inquire of the hostess as to that fact and he thought the plane was not in motion because he had no sense of motion at that time. When he fell out he fell forward, landing on his feet.

■ There is some testimony from some of these witnesses that plaintiff told them that he jumped from the plane. This he denied. There was further testimony to the effect that there was no lurch of the plane and that the movement of the plane was very slight and even and was upon a smooth surface. It will be noted, however, that all of the witnesses thus testifying were on the ground with the exception of the hostess, and she was seated in the plane. However, she testified that the ground the plane was on was very rough "just like a farmyard and the ground was as though it had been just plowed, very rugged." Defendant, however, says that she evidently referred to the ground off the runway. We have no way of knowing what she meant. That was for the jury to determine.

Defendant stresses very strongly that the plane was of such weight that it was impossible for it to lurch. The origin of

410

that word seems to be very obscure, but our lexicographers define it as a sudden roll of a ship to one side; the swaying or staggering movement to one side, as of a drunken man. The Oxford dictionary gives it as a sudden roll or staggering movement in any direction.

We are not favored with the arguments of counsel to the jury in this case, but as this one point is. stressed more than any other in this record we have no doubt that it was argued very fully to the jury, and as it is purely a question of fact for the jury to determine we cannot disturb their finding in this respect.

Moreover, we think it would be rather unusual and unexpected for any person of average intelligence to leap voluntarily from a lighted plane a distance of four feet into the darkness. We have no doubt that it would be almost impossible for these men to move that vast amount of weight with anything like a jerk or rapid movement, but whether or not a change in direction of the plane, while turning off the runway, would cause such a movement, or other kind of a movement, which would jostle him off the plane we are unable to say, and this record does not indicate the answer.

However, appellee does not rely entirely on the alleged sudden and violent lurch of the plane. He also relies on the alleged fact that appellant carelessly and negligently allowed the door of the airplane to remain open while it was in motion and failed to warn him and to protect him from the incidents of such condition.

Appellant does not deny that appellee was the last man to leave the plane and Doctor Seibel had left a short time before. The latter admitted that he left the door open and it is admitted that the pilot and the hostess remained on the plane and both knew that the plane was in motion. Plaintiff did not know that it was in motion and was never even cautioned to stay away from the open door under such circumstances. He was merely complying with the request of the pilot to be helpful, and it seems to us that even ordinary care would require that such door be kept closed after the plane began to move.

We are convinced that all these questions, including plaintiff's contributory negligence, if any, were for the jury to answer, and we are not permitted to disturb its answers.

A court is not free to reweigh the evidence and set aside a verdict merely because the jury could have drawn different inferences or conclusions, or because the appellate court might regard another result as more reasonable. Tennant v. Peoria & Pekin Union Railway Co., 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520. See also Surdyk v. Indiana Harbor Belt R. Co., 7 Cir., 148 F.2d 795. It is only where there is a complete absence of probative facts to support the jury's conclusion that reversible error appears. Lavender v. Kurn, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916. 'Negligence or contributory negligence does not become a question of law alone, unless the acts constituting it are of such character that all reasonable men would concur in pronouncing them so. Surdyk v. Indiana Harbor Belt R. Co., supra.

Judgment affirmed.