410 F.2d 78
 Giuseppe OFMANI, Plaintiff-Appellee-Cross-Appellant,
v.
NEDERLANDSCH — AMERIKAANSCHE STOOMVAART MAATSCHAPPIJ a/k/a Holland-America Line, Defendant and Third-Party Plaintiff-Appellant-Cross-Appellee,
v.
INTERNATIONAL TERMINAL OPERATING CO., Inc., Third-Party Defendant-Appellant-Cross-Appellee.
 No. 390.
 No. 391.
 No. 392.
 Docket 32535.
 Docket 32536.
 Docket 32548.
 United States Court of Appeals Second Circuit.
 Argued February 19, 1969.
 Decided May 1, 1969.
 
 Baker, Garber, Chazen & Duffy, Hoboken, N. J. (Milton Garber and George J. Duffy, Hoboken, N. J., of counsel), for plaintiff-appellee and cross-appellant.
 Schaffner & D'Onofrio, New York, City (John J. Langan, New York City, of counsel), for defendant and third-party plaintiff-appellant-cross-appellee.
 Alexander, Ash & Schwartz, New York City (Sidney A. Schwartz, Joseph Arthur Cohen, Henry V. Kerr, New York City, of counsel), for third-party defendant-appellant.
 Before CLARK, Associate Justice, Supreme Court of the United States, Retired,* and WATERMAN and FRIENDLY, Circuit Judges.
 
 CLARK, Justice, Retired:
 
 1
 This is a personal injury action brought by Ofmani, a longshoreman, against the Holland-America Line, owner of the S.S. Schiedyk, alleging negligence and unseaworthiness in the loading of the vessel. Holland-America impleaded the stevedore employer, International Terminal Operating Co., Inc., claiming that liability, if any, was the result of negligence and breach of implied warranty of workmanlike performance by the latter. Trial was before a jury and a special verdict was returned against Ofmani on his unseaworthiness claim but in his favor and against Holland-America for $20,000 on the claim of negligence. A verdict for Holland-America over against International on the former's indemnity action was returned and a judgment entered accordingly. The case is a factual one and we affirm.
 
 I.
 
 2
 The S.S. Shiedyk was being loaded with freight at the time of the accident. The ship was docked alongside the Sixth Street Pier in Hoboken, N. J. which extended like a finger from the shore into the Hudson River and was in the possession and control of Holland-America. A two-level building covered the major portion of the pier which had a loading platform that ran alongside it and next to the ship. This platform, known as a "string piece," was four feet wide. The building, which was devoted primarily to the storage of cargo, was of steel construction. On the side of the building next to the string piece was a row of wide wood doors, covered with steel or aluminum plating, through which the freight was moved from the pier building on to the ship. These doors were located at both levels of the pier building and opened on rollers flush with the building. The freight, on the occasion in question, had been packed in metal containers approximately 8 by 8 by 10 feet in size which were being loaded by means of rigging. The latter consisted of a ship fall, which is a cable runner leading from the ship's starboard winch through the ship's boom and shackled or "married" to a second cable runner, operated from the port winch. The second cable runner was reeved through a block attached to a "span" or steel frame that protruded vertically above the side wall on top of the pier building directly above the door from which the containers were being loaded. From the span this cable runner, known as a "house fall," dropped down to the pier for attachment to the containers. It is this section that is married to the ship's fall. This rigging lifts the cargo by means of the house fall while the ship fall guides it to the proper place on the ship.
 
 
 3
 Each container has four lifting rings located at each of its four upper corners that are used in lifting it. A four-legged bridle on the end of the house fall is attached to the container by hooks which are slipped into the respective rings by longshoremen. In the loading process the container is moved from the pier building onto the string piece. However, the latter being only four feet wide permits the container to be moved only "a quarter way out" through the door and outside the pier building. While in this position the house fall is attached, the hooks being placed in the rings by four longshoremen, two inside the building and two on the string piece. After being hooked up, the house fall is then tightened and the container eased out of the building and lifted up and over onto the ship. When the house fall is attached, it is running up and alongside the pier building to the span and from there over to the ship's winch. As it is tightened it hammers against the side of the pier building with some force. In order to prevent this hammering from chaffing the cable runner of the house fall and destroying it, a wooden plank some ten inches wide, five inches thick and fourteen feet long is bolted along the outside wall of the pier building and above the doors on the lower level. Another such beam is bolted above the doors on the upper level. These are known as "wearing pieces" and protect the cable runner of the house fall from the force of its continual beating against the pier building wall during the loading process. These wearing pieces become "all chewed up" after about a year and "got a lot of abuse." The record fails to disclose how often they were repaired.
 
 II.
 
 4
 On the occasion in question, the containers were being loaded from the lower level of the pier building. Ofmani's job was to hook up one of the front rings at the four corners of the freight containers as they were loaded on board the ship. The particular container had been moved about "a quarter way out" onto the string piece, with three-quarters of the container inside the building and protruding inside the door opening. The hooks had all been slipped into the rings on the container but when the cable runner on the house fall was tightened, the strain went to the back hooks on the corners of the container inside the door. This caused the cable runner to hit against the pier building wall and Ofmani's front hook shook loose. The winch operator told him to re-hook it and in doing so he climbed on a milk box on the string piece in order to reach the hook and the ring on the corner of the freight container that was out on the string piece. At this point the winch operator loosened the house fall to permit the hook to be placed in the ring and then tightened it. While this was being done, Ofmani who was standing on the milk box out on the string piece was hit in the head by a piece of flying plank some three feet long, four inches wide and an inch or so thick. The winch operator testified that as he "got the strain on these wires, at that moment, I see a piece of wood drop, hitting him, and he fell back, and hit and I see him rolling to the pier * * *." The operator said that he saw the piece of wood "passing practically even with the fall coming, dropping * * * from the upper part of the pier * * * I couldn't give you any specific place * * * it couldn't come from outside" however. The wood was painted green on one side, the same color as the pier building and was "broken off" at the end. The left door on the upper level above the container was closed and no workmen were on that level.
 
 III.
 
 5
 The evidence is uncontradicted that the freight container was only about one-fourth of the way out on the string piece when Ofmani was directed to re-hook his corner ring. The rest of the container protruded through the door and inside the pier building. The container stood too high for Ofmani to reach its top where the ring was located. He, therefore, stood on the milk box with his body next to the container and reached up to fit the hook in the ring. This placed him some two feet or less from the pier building wall. When the cable runner was tightened and loosened in the re-hooking process, the evidence stands uncontradicted that it hit against the pier building wall. Ofmani says that it dislodged the piece of wood from the wearing pieces directly above him, and it fell upon his head causing the injury. The jury so found. Holland-America says that it was not established by direct evidence that the wood came from its building; that none of its personnel were present in the work area and that the evidence is not sufficient to create an inference that it failed to perform any act or omitted any duty that was the proximate cause of the accident.
 
 
 6
 We cannot agree with Holland-America. If the Supreme Court has taught anything in these personal injury cases, it is that jury verdicts based on evidence such as we have here must not be disturbed. As early as Tennant v. Peoria & P. U. R. Co., 321 U.S. 29, 64 S.Ct. 408, 88 L.Ed. 520 (1944) the Court found that the "focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury. It is the jury, not the court, which is the fact-finding body." At 35, 64 S.Ct. at 412. And in Rogers v. Missouri Pacific R. Co., 352 U.S. 500, 77 S. Ct. 443, 1 L.Ed.2d 493 (1957) the test was laid down "whether the proofs justify with reason the conclusion that * * negligence played any part, even the slightest, in producing the injury * *." At 506, 77 S.Ct. at 448. There the Court also held that the "burden * * * is met, and the obligation * * * to pay damages arises, when there is proof, even though entirely circumstantial, from which the jury may with reason make that inference." At 508, 77 S.Ct. at 449. Thereafter in Michalic v. Cleveland Tankers, Inc., 364 U.S. 325, 81 S.Ct. 6, 5 L.Ed.2d 20 (1960) the Court again emphasized that "direct evidence of a fact is not required. Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive." At 330, 81 S.Ct. at 11. The evidence in Michalic's case was much thinner than that here. Likewise in Lavender v. Kurn, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916 (1946) the Court re-instated a verdict based on evidence which had been characterized in the state court as "mere speculation and conjecture" and in the face of a theory of negligence that was "physically and mathematically impossible." The Court further held that theoretical evidence was irrelevant upon the appeal since there was a reasonable basis in the record for inferring that the accident occurred as the jury found. "The jury having made that inference," the Court held, "it would be an undue invasion of the jury's historic function for an appellate court to * * * arrive at a conclusion opposite from the one reached by the jury." At 652-653, 66 S.Ct. at 744. The same reasoning is apposite here.
 
 
 7
 There was no conflict in the evidence: Holland-America admitted that it owned the vessel and had control of the pier; that Ofmani was injured by the falling piece of wood and that it was painted the same color as the pier. It was not contradicted that the "wearing pieces" took a "lot of abuse" and became all "chewed up" from the beating of the cable runner against them; that the cable runner was beating the wearing pieces attached to the building and directly above Ofmani on this occasion; that the piece of wood in question dropped from the upper part of the pier "passing practically even with the fall"; and, significantly, that the piece of wood "couldn't come from outside." It was not disputed that the upper level door over which the house fall was located was closed and that no one was on that level.
 
 
 8
 We can only say that the inference of the jury that the piece of wood came from Holland-America's "wearing pieces" was not only reasonable but inescapable.
 
 
 9
 Nor do we find any substance to the claim that the charge on the doctrine of Res Ipsa Loquitur was prejudicial and erroneous. The case was submitted on special issues, the second numbered one being "Do you find that Ofmani established his claim of negligence?" While the judge purported to be charging on the "Res Ipsa Loquitur doctrine," his words amounted to little more than an instruction on what inference could be drawn logically from the evidence.
 
 IV.
 
 10
 In its indemnity action Holland-America supports its judgment on the finding of the jury, in answer to special issue numbered four, that it had established its claim of indemnity against the International. The only evidence introduced at the trial — save the indemnity contract between Holland and International — was that outlined above. The contract provided that International would carry out its work "in a safe and efficient manner." As we have noted, the evidence indicated that the cable runner on the house fall continually struck the wearing pieces on the pier building with great force. International was the owner and operator of the house fall. Holland-America contends that this continual pounding of the cable runner was the cause of the piece of wood becoming dislodged and falling upon Ofmani. This conduct, it says, fell short of that workmanlike service to which it was entitled under the contract. No evidence was offered in rebuttal. There was no objection to the charge. The jury was, therefore, fully warranted in answering the special issue as it did and we find no error in the entry of the judgment over against International.
 
 
 11
 The judgment of the District Court is, therefore,
 
 
 12
 Affirmed.
 
 
 
 Notes:
 
 
 *
 Associate Justice, United States Supreme Court, Retired, sitting by designation