**Gabriel G. RUBIN**

v.

**UNITED STATES of America.**

**Civ. A. No. 72–350.**

United States District Court,
W. D. Pennsylvania.

Sept. 3, 1974.

---

1. In the record the name of the witness is Romel Nicholas.

2. See defendant's Motion, reason number 6; See also Tr. pp. 798–799.

David M. Kaufman, Pittsburgh, Pa., Carroll J. Savage, Washington, D. C., for plaintiff.

Thomas Daley, Robert M. Adler, Dept. of Justice, Washington D. C., for defendant.

## OPINION

KNOX, District Judge.

The question in this civil action is whether the plaintiff Gabriel G. Rubin is liable under Internal Revenue Code, Section 6672 [1] as a person who willfully failed to collect, truthfully account for and pay over to the United States certain withholding taxes of the Minnesota Pipers, Inc., a Minnesota corporation. The Commissioner of Internal Revenue assessed a 100% penalty of $44,213.92 against Rubin for the fourth quarter of 1968 and the first three quarters of 1969.[2] Rubin paid $25.00 of the penalty for each quarter, filed a claim for refund which was denied, and brought suit. The United States counterclaimed for $44,113.92, the unpaid balance of the assessment. After a week long trial, a jury found Rubin liable for the third quarter of 1969, but not liable for the three previous quarters.[3] The result of all this was that Rubin was held liable for $85.41, out of the total assessment of $44,213.92.

Both the United States and Rubin have moved to alter or amend judgment, or alternatively, for judgment notwithstanding the verdict or a new trial. The United States contends that since the jury found Rubin to be a "responsible person" acting "willfully" for the third quarter of 1969, then preferences by Rubin to creditors other than the government make him liable for whatever taxes were then due, without regard to whether the preferences occurred in the same or a later period than that in which the tax liability arose and regardless of whether Rubin at any time during these quarters had corporate funds in his hands to pay these taxes. The government urges that on the record before us Rubin must be found liable for

---

1. Internal Revenue Code § 6672, 26 U.S.C. 6672, reads as follows:

   "Failure to Collect and Pay Over Tax, Or Attempt to Evade or Defeat Tax.

   Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over. No penalty shall be imposed under section 6653 for any offense to which this section is applicable."

2. A breakdown of the assessment by quarters, though not appearing on the face of any exhibits, is agreed by the parties to be:

   | Tax Period | Penalty Assessed |
   | --- | --- |
   | 4th quarter of 1968 | $ 466.80 |
   | 1st quarter of 1969 | 36,214.91 |
   | 2nd quarter of 1969 | 7,446.80 |
   | 3rd quarter of 1969 | 85.41 |
   | Total | $44,213.92 |

3. The Special verdict submitted to the jury was in the following form:

   SPECIAL VERDICT

   The jury is directed to answer the following questions:

   1. Was Gabriel G. Rubin a responsible person who was under a duty to truthfully account for and to pay over to the United States the taxes withheld from the employees of Minnesota Pipers, Inc. under previous instructions of the court?

   ANSWER: Yes

   2. Was Gabriel G. Rubin a person who wilfully failed to collect such tax or truthfully account for and pay over such tax?

   ANSWER: Yes

   3. If your answers to both of the above two questions are "yes", then for which quarters do you find him to be liable?

   1968—4th quarter—Answer: No

   1969—1st quarter—Answer: No

   1969—2nd quarter—Answer: No

   1969—3rd quarter—Answer: Yes

the entire tax, and that the jury's verdict of liability only for the third quarter of 1969 is inconsistent and contrary to the court's charge. Rubin disputes the government's interpretation of the facts and the law and further urges that the jury's findings of "responsibility" and "willfullness" for the third quarter of 1969 are not supported by the evidence and are conjectural in light of the jury's implicit finding for the three prior quarters that Rubin was not responsible or did not act willfully.

Not without difficulty, the court has determined that the jury verdict is proper and that the judgment entered pursuant to that verdict will stand.

■ In our charge to the jury, we incorporated defendant's Requested Jury Instruction No. 19:

"Even if you determine that Gabriel G. Rubin became a responsible person only at the time that the Minnesota Pipers returned to Pittsburgh in July of 1969, I charge you that he *may* still be liable for the taxes in dispute for the fourth quarter of 1968, and the first three quarters of 1969. The plaintiff is liable for such taxes *if* after the Minnesota Pipers returned to Pittsburgh, *he became a responsible person* of the company, as I have previously defined 'responsible' for you. If you determine that Gabriel G. Rubin became a responsible person at that time, you must then go on to determine whether Mr. Rubin acted 'willfully'. He acted willfully, if after July of 1969, he had knowledge of the delinquent withholding taxes of the Minnesota Pipers, Inc., but nonetheless directed funds to pay suppliers, employees' net take home salaries, rent, or any creditor, other than the government."

The court also gave the defendant's Requested Jury Instruction No. 20:

"If you find that, as Gabriel G. Rubin contends, that he had no knowledge of the delinquent withholding tax

liability of the Minnesota Pipers, Inc. until the first week of July, 1969, you must still determine that he acted willfully, if you find that after that date, he decided to use funds of the Minnesota Pipers, Inc. to pay suppliers, employees' net take home salaries, rent, or any creditor, other than the government."

These charges do not preclude a finding of nonliability for earlier quarters despite a finding of liability for the third quarter of 1969. The jury was told that the plaintiff "may" be liable. The charge read as a whole allows the possibility of judgment for the United States for some, but not all, of the four periods in question. The defendant not only submitted the points for charge Nos. 19 and 20 but also failed to object to the form of the special interrogatories[4] which on their face permitted the jury to find liability for any combination of the four tax quarters. Regarding the form of the verdict, the court instructed the jury as follows:

"Now, if you answer these questions [Nos. 1 and 2] 'no' why, that is the end of the case and you need not bother with number 3. If, however, your answers on both of the above two questions are 'yes', then for which quarters do you find him to be liable? I am asking you to take up each quarter, the last quarter of 1968 and the first three quarters of 1969, and answer 'yes' or 'no' as to each one of those quarters, whether you find him liable in the event you have answered questions 1 and 2 'yes'." Transcript, page 446.

Some federal courts have indicated that a failure to object to interrogatories before the jury retires precludes a later challenge that the interrogatories were erroneous. Kirkendoll v. Neustrom, 379 F.2d 694 (10th Cir. 1967); cf., Bernstein v. Olian, 77 F.Supp. 672 (S. D.N.Y.1948) (explicit charge without objection that jury could find against

4. Transcript, page 466.

one or more of the defendants precluded challenge of inconsistency to verdict exonerating two defendants but not the third). That rule is implied through the more general statement in Rule 51, F.R.C.P.:

"No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection."

■ We realize, of course, that the United States does not purport to challenge the instructions or special interrogatories as erroneous. Their position is that the answers are inconsistent in light of the charge. Nevertheless, where the United States insists that Rubin cannot be found liable only for the third quarter of 1969 but the charge and interrogatories permitted that result, the net effect is a challenge to the interrogatories. The United States cannot have the best of both worlds by sitting back and allowing the jury to deliberate and to reach a verdict, perhaps through compromise, with the jury believing that they can find the plaintiff liable for only one of the quarters in question, only to later stand up and ask for judgment for all four quarters on the basis of the jury's determination of liability for one quarter alone.

We do not, however, rest our decision on this technical, narrow basis. As we have stated, the court believes the verdict to be supported by substantial evidence.

The standards to be applied in reviewing a jury verdict have often been stated. One such statement appears in Lavender v. Kurn, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916 (1945):

"It is no answer to say that the jury's verdict involved speculation and conjecture. * * * Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear. But where, as here, there is an evidentiary basis

for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion. And the appellate court's function is exhausted when that evidentiary basis becomes apparent, it being immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable."

■ The facts in this case are lengthy, but must be set out in some detail to show the issues before the jury. Surprisingly, there is little dispute over the underlying facts. The difficulty is what inferences and conclusions are to be drawn from them. Since our purpose is to determine whether the verdict is supported by sufficient evidence, our statement of the facts here does not necessarily represent findings by the court, although we cannot say the verdict is against the weight of the evidence thus necessitating a new trial.

The story of this case begins with plaintiff Rubin's ownership of and association with a professional basketball team known as the Pittsburgh Pipers. In 1968, Rubin sold this team to a Mr. William Erickson of Minneapolis, Minnesota, for $500,000, of which $225,000 was paid down and the balance of which was covered by notes. These notes were never paid. In addition, Rubin received a fifteen percent interest in the stock of the new buyer, Minnesota Pipers, Inc. Rubin was named Chairman of the Board, a title he considered honorary and bestowed for publicity reasons. Rubin's relationship to Minnesota Pipers, Inc., is the question on which this case centers.

From the outset, the Minnesota Pipers suffered financial difficulties. In November of 1968, an agreement (Plaintiff's Exhibit 6) was signed between the Minnesota Pipers, Inc. and the Pipers Basketball Club, Inc., a buying group that supposedly had a firm underwriting commitment. Stock of Pipers Basketball Club, Inc., was to be sold publicly, and the proceeds used to pay the purchase price for the Minnesota Piper

team. Rubin had a four percent beneficial interest in the buying group, Pipers Basketball Club, Inc. Rubin explains his minority interests in Minnesota Pipers, Inc., and Pipers Basketball, Inc., as the result of persuasion to lend his advice, experience in league matters, and knowledge of players to those corporations, along with his general interest in basketball.

An unsuccessful season in Minnesota led to a decision to move to a new playing site. Both the American Basketball Association and the Securities Exchange Commission desired to know the playing site for the 1969–1970 season. A decision was made to return the team to Pittsburgh.

The underwriting efforts for the proposed public offering encountered difficulties. Little interest was shown in the stock in Western Pennsylvania, and in general the stock market was unfavorable in the summer and fall of 1969.

The move from Minnesota to Pittsburgh was made in July of 1969. From that time on, Rubin directed the operations of the team. All disbursements were made through an account in Rubin's own name. Rubin paid all of the bills, including funds to ballplayers, coach, trainers, printing and advertising firms, airlines, hotels and the Pittsburgh Civic Arena. The operation of the team in Pittsburgh was pursuant to an agreement between the Pipers Basketball Club, Inc., and the Minnesota Pipers, Inc. (Defendant's Exhibit Z). Rubin understood this agreement to represent a promise to reimburse him for all expenses incurred by him in the operation of the team in Pittsburgh.

Rubin's agreement to operate the team in Pittsburgh was due in part to his desire to see that outstanding league assessments were paid and the franchise kept intact until the time of the eventual public sale of stock. At the time the team returned to Pittsburgh, Rubin still had hopes that the underwriting would succeed. By September, 1969, however, both the initial underwriting effort and a later attempt by another underwriter failed. Rubin's interest in the sale of the team, of course, was because of the outstanding notes payable to him, which were uncollectible, and his fifteen percent ownership of stock in Minnesota Pipers. Numerous private efforts to sell the Minnesota team were also made through October, 1969.

After the sale possibilities diminished, Rubin asked the A.B.A. to revoke the Minnesota franchise and give him a new one. The league agreed to this, provided dues and assessments in arrears were paid. Rubin on an uncertain date paid the league $45,000 in dues and assessments owed by the Minnesota Pipers. On or about January 7, 1970, the league revoked the Minnesota franchise for non-payment of assessments.

Between July 1, 1969, and December 31, 1969, gate receipts at the Arena were $34,226.89. The season actually opened however, October 15, 1969, and most of those receipts were after that date. Total expenses during this period were $286,000. Rubin paid these expenses from his own personal funds, or from funds he personally borrowed. Rubin testified that when the season started at the Civic Arena, the arena collected all monies at the box office and credited them to the nightly rental. The receipts were so small that they continually ran behind the rental and Rubin seldom, if ever, received any of those funds.

The lease with the Arena was signed in Rubin's own name. The bank account and checks were also in his name. Rubin paid withholding taxes for the 1969–1970 season under his own government number and name. *No corporate funds were ever transferred or used by the plaintiff.* Never while Rubin operated the team in Pittsburgh did he receive any monies from Erickson or Mikkelson, officials of the Minnesota Pipers. Rubin did not have the books or records, minute book, checkbook, or seal of the Minnesota Pipers in his possession. He did receive possession of certain equip-

ment and paraphernalia in the summer of 1970. Their value would be small.

The evidence further showed that Rubin was a signatory on the Minnesota Pipers, Inc. checking account, but two signatures were required to draw a check and there was no evidence that he ever signed one. Rubin's signature did appear on many corporate minutes and documents, including player contracts. Signing up of new players was a condition of the selling agreement between Rubin and Minnesota Pipers Inc. As to the other corporate documents, Rubin says he signed them perfunctorily when Mikkelson or Erickson presented them to him.

The only other funds in Rubin's possession when he ran the team in Pittsburgh were $20,000, sent to him by members of the purchasing group, Pipers Basketball Club, to pay the league and reserve the Arena.

This statement of facts suggests a number of matters for the jury to resolve. When Rubin paid certain debts of the Minnesota Pipers after he took over the operations after July 1, 1969, did he do so pursuant to a contract with Pipers Basketball Club, Inc., rather than as an agent of the Minnesota Pipers? Did Rubin actually have control of corporate funds with which he favored other creditors or did he use only his own funds? Was Rubin's relationship to Minnesota Pipers such that by "loaning" his own funds to pay corporate debts, *his funds became corporate funds*? Did Rubin have the authority or consent of Minnesota Pipers to pay the back withholding taxes, or was he only permitted to operate the team and pay necessary current expenses? Were the $34,000 in gate receipts in 1969 actually within Rubin's control, or as Rubin testified, was the agreement with the Pittsburgh Civic Arena the only method by which he could secure a site for games? When Rubin obtained the league franchise in 1970 by paying past due league assessments, was he simply paying a Minnesota Piper debt or was he purchasing the franchise in his own behalf

at a price, set by the league, yet reflective of the amount due from the Minnesota Pipers?

These and other questions may have been considered by the jury in determining whether Rubin was a responsible person who willfully failed to pay the Minnesota Piper taxes. The jury had before them considerable evidence on both sides from which they could have reached either conclusion. Their actual conclusion that only in the third quarter of 1969 did Rubin have the necessary responsibility and willfullness is a plausible one, for that is the time when Rubin became most active in the day to day operations of the team and began disbursing funds, whether his own or otherwise, to pay debts associated with the team.

▮ The jury also had an evidentiary basis to determine that Rubin did not have sufficient *corporate*, rather than *personal,* funds within his control to charge him with the responsibility to pay taxes arising in previous taxable quarters, even though they found him liable for the quarter in which he actively managed the team. We are not prepared to say as a matter of law that such a determination was arbitrary. Different factors are involved in holding a responsible person liable for taxes arising prior to his term of responsibility than for taxes arising during his "reign" as a responsible corporate agent. "Current" liability could be based on the mere payment of wages, while "prior" liability must be predicated in part by the availability of *corporate* funds or property with which the responsible person might have paid the past-due taxes.

The government argues that the line of cases represented by Stake v. United States, 347 F.Supp. 823 (D.C.Minn. 1972) and Walker v. United States, 24 A.F.T.R.2d 69–5661 (D.C.Ga.1969), aff'd *per curiam*, 438 F.2d 127 (5th Cir. 1971), require entry of judgment for the United States for all four quarters in issue. In Stake and Walker, judgment was entered for the United States for prior tax

quarters where the jury found the plaintiffs to be responsible persons and the record clearly showed that they subsequently preferred other creditors over the United States despite knowledge of the tax obligations. The fact that the tax obligations arose prior to the time plaintiff became a responsible person was deemed irrelevant. While the court believes the Stake and Walker decisions to be sound, we do not find them controlling in this case.

Implicit in the cases cited by the United States is the fact that the persons held liable had within their control substantial funds of the corporation which they paid to other creditors. Insofar as the cases indicate, those funds exceeded, *in toto*, the past tax liabilities. Liability under Section 6672 was predicated on knowledge of the tax and the willful failure to pay. Willfulness, in this context, would require the availability of corporate funds. These cases therefore actually involve misapplication of corporate funds to the payment of other creditors instead of first applying the funds to the preferred claims of the United States for withholding taxes.

■ We do not believe the law to be that a preference to one creditor, no matter how small, would make the responsible agent personally accountable for the entire tax obligation, no matter how great. Rather, Section 7501 creates a trust, and a trustee who wrongfully applies trust funds will be held liable. But that liability would not exceed the amount entrusted. Thus, if "C", the custodian of "A's" property, transfers it to "R", the recipient, and that transfer is fraudulent as to "A's" creditor "Cr", then both "C" and "R" might be liable to "Cr" for the amount transferred, but not for "A's" entire debt to "Cr".

■ Similarly, here, even though the jury found Rubin to be a responsible person who willfully failed to pay the taxes to the United States in the third quarter of 1969, it does not follow, *ipso facto*, that he is liable for the entire tax for all four quarters at issue. On the record in this case, the jury had sufficient evidence on which they might determine willfullness lacking as to these prior quarters.

In this regard, the present case is distinguishable from Stake, supra, and Walker, supra. Here, the jury faced a viable question as to whether plaintiff paid corporate creditors with corporate funds in deliberate and conscious preference over the government. In Stake and Walker the plaintiffs unquestionably used corporate funds to pay those debts, and the mere finding by the jury of responsibility and willfullness as of a later time was sufficient basis for the court to impose liability for taxes arising at an earlier time. To so rule here would be to take from the jury a question of fact which they have determined adversely to the government.

The court therefore concludes that the verdict of the jury is not inconsistent and is based on sufficient evidence. An appropriate order will be entered.